McCULLOUGH TOOL COMPANY, Robert W. Pringle, Kenneth I. Roulston, George M. Brownell and Philip W. Martin, Appellants,

v.

WELL SURVEYS, INC., and Dresser Industries, Inc., a Corporation, Appellees.

McCULLOUGH TOOL COMPANY, Appellant,

v.

WELL SURVEYS, INC., Appellee.

WELL SURVEYS, INC., and Dresser Industries, Inc., Appellants,

v.

McCULLOUGH TOOL COMPANY, Robert W. Pringle, Kenneth I. Roulston, George M. Brownell and Philip W. Martin, Appellees (two cases).

WELL SURVEYS, INC., Appellant,

v.

McCULLOUGH TOOL COMPANY, Appellee.

Nos. 6952–6956.

United States Court of Appeals Tenth Circuit.

March 17, 1965.

Rehearing Denied April 20, 1965.

R. Welton Whann, Los Angeles, Cal., Richard B. McDermott, Tulsa, Okl., and Edwin A. Oser, Los Angeles, Cal. (Robert M. McManigal and James E. Harrington, Los Angeles, Cal., on the briefs), for McCullough Tool Co., Robert W. Pringle, Kenneth I. Roulston, George M. Brownell and Philip W. Martin.

Robert W. Fulwider, Los Angeles, Cal., and Rufus S. Day, Jr., Cleveland, Ohio (Farmer, Woolsey, Flippo & Bailey, Tulsa, Okl., Fulwider, Patton, Rieber & Utecht, Los Angeles, Cal., McAfee, Hanning, Newcomer, Hazlett & Wheeler, Cleveland, Ohio, Anderson, Luedeka, Fitch, Even & Tabin, Chicago, Ill., on the briefs), for Well Surveys, Inc., and Dresser Industries, Inc.

Before MURRAH, Chief Judge, BREITENSTEIN and HILL, Circuit Judges.

HILL, Circuit Judge.

The appeals and cross-appeals in these consolidated cases involve the validity, infringement and misuse, together with the purge of such misuse, of three patents [1] owned by Well Surveys, Inc. (hereinafter referred to as WSI), and the validity and infringement of one patent [2] owned by Robert W. Pringle, Kenneth I. Roulston, George M. Brownell and Philip W. Martin, which is subject to an exclusive license in favor of McCullough Tool Company. For convenience we will hereinafter refer to all of the latter parties as McCullough. The first case was filed by WSI in the Southern District of Texas and thereafter transferred to the Northern District of Oklahoma. In this suit, WSI charged McCullough Tool Company with infringement of the Bender Reissue, Fearon and Swift patents. McCullough Tool Company answered denying infringement and asserting the usual defenses of invalidity, lack of invention and misrepresentation by the patentees to the Patent Office and defects in the issuance of the Bender Reissue Patent as well as misuse of all three of the patents. In the second case, commenced in the court below by McCullough Tool Company, it alleged that WSI misused the three patents and sought a declaratory judgment of unenforceability, invalidity and non-infringement of such patents. By subsequent amendments to the complaint: Lane-Wells Company was made a party defendant and it and WSI were charged with infringement of the Pringle Patent; Pringle, Roulston, Brownell and Martin were made parties plaintiff; and Dresser Industries, Inc., was substituted for Lane-Wells.

The lower court consolidated the two cases for trial and, after making extensive findings of fact and conclusions of law reported at 199 F.Supp. 374, entered judgment in accordance therewith. In Case Nos. 6952 and 6953, McCullough appeals from those portions of the judgment holding: (1) The Bender Reissue, Fearon and Swift patents to be valid and infringed; (2) the Pringle patent to be valid only when limited to a certain apparatus and, as limited, non-infringed; (3) that WSI had not misused its patents after June 1, 1956, but had purged itself as of that date and was entitled to enforce its patents against infringement subsequent thereto; and (4) denying their motion for a new trial. The appeals and cross-appeals in Case Nos. 6954, 6955 and 6956 by WSI and Dresser are from those portions of the judgment holding: (1) The Pringle patent to be valid even as limited; and (2) WSI had misused its valid patents from June 11, 1940, to June 1, 1956.

The subject matter of the patents in suit relate to a method and apparatus for the logging of oil wells. Radioactivity well logging is the only method for logging an oil well through the casing and the first commercial logging services were offered to the oil industry by WSI and Lane-Wells. The term "radioactivity well logging" was originally applied to methods of detecting and measuring radiation naturally emitted by the formations of the earth around an oil well, but it soon became a generic term and is

---

1. The three patents are: Patent No. Re. 23,226 (hereinafter referred to as the Bender Reissue Patent); Patent No. 2,308,361 (hereinafter referred to as the Fearon Patent); Patent No. 2,554,844 (hereinafter referred to as the Swift Patent).

2. This patent is Patent No. 2,686,266. (hereinafter referred to as the Pringle Patent).

now used to designate any well logging in which radiations coming from the formations, whether naturally or artificially produced, are detected and measured. There are various types of radioactivity well logging, including gamma ray logging and neutron logging.

We will first consider the validity of the patents in suit and will follow the rule that the findings of the Patent Office, especially when confirmed by the District Court, as they are here, will not be overturned by this court unless clearly infected with error. Johns-Manville Corporation v. Ladd, 117 U.S.App. D.C. 262, 328 F.2d 563. In this Circuit the better practice is to first consider the issue of the validity of a patent and then the issue of infringement. Sears, Roebuck & Co. v. Jones, 10 Cir., 308 F. 2d 705, cert. denied, 371 U.S. 952, 83 S. Ct. 509, 9 L.Ed.2d 501.

### Bender Reissue Patent

The Bender Reissue Patent is for a "Subsurface Prospecting Device". It was issued to Lane-Wells on October 18, 1938, as Patent No. 2,133,776. The application and patent states that the invention disclosed therein " * * * relates to a subsurface prospecting device which may be employed to detect the location of radio-active formations and particularly where such formations have been penetrated by a well bore so that the instrument may be passed through the formation and in this manner detect the presence of the formation." The objects of the invention, as stated in the patent, are to: (1) Locate petroleum sands and other radioactive materials by means of detecting the location of secondary emissions therefrom; (2) detect the presence of petroleum sands outside of a well casing in which the instrument is being operated; and (3) lower a radiant energy detecting device into a bore well so that the radiant energy may be recorded at the surface and thereby establish the type of material at a particular depth.

The application for reissuance was filed on October 4, 1940, and it was issued on May 9, 1950, as Patent No. Re. 23,226 to Lane-Wells, which subsequently assigned it to WSI. The stated reason for seeking the reissuance was to obtain new claims 14–21, which cover a subject matter alleged to have been disclosed but not claimed in the original patent. In this connection, the record shows that, while thirteen claims were allowed in the original patent, two claims, 7 and 8,[3] were contained in the original application but were cancelled on July 20, 1938. The new claims, 14 through 21, were identical with certain counts of interference then pending in the Patent Office. Bender became a party to that proceeding and ultimately prevailed with the Patent Office holding that the original application disclosed and supported the material covered by the new claims in the reissue application. The record also shows that the two drawings of the Bender device contained in the original application and patent remain unchanged in the reissue patent.

The claims in issue relate to a method and apparatus for measuring radiations emanating from earth formations traversed by a bore hole and thereby to produce a radioactivity log of such subsurface formations. This invention teaches what is known as natural gamma ray logging and involves detecting and measuring the natural radioactivity of formations outside of and around the well casing. It utilizes the fact that earth formations exhibit natural gamma ray activity to a greater or lesser degree depending upon the type of formation, i. e., for example, shales and clays contain larger amounts of gamma ray emitting

---

3. They read as follows:
"7. A method of detecting the presence of radio active formations in well bores comprising the steps of lowering an electronic pickup device into the well bore and detecting the electronic bombardment of the device by such formation.

"8. A method of detecting the presence of radio active formations in well bores comprising the steps of lowering an electronic pickup device into the well bore, detecting the electronic bombardment of the device by such formation and indicating the saturation of such formation by the volume of bombardment detected."

materials than do sandstones or limestones. The device used for detecting and measuring the gamma rays may be described as a radiation detector, i. e., Geiger counter, which is contained within a housing or lead cylinder that is lowered into the well by means of a cable. As the cylinder is lowered within the well casing, the radioactive signals produced by the earth formation outside of the well casing are detected by the Geiger counter and transmitted through a conductor located within the cable to the surface where, by means of a mechanical device, they are recorded in correlation with depth to produce an oil well log. This log gives information concerning the lithology of the subsurface formations.

 McCullough first contends that this patent is invalid because the invention disclosed in the reissue claims in suit is wholly different from that intended to be covered by, or disclosed in, the original patent. A reissue patent, to be valid, must be for the same invention as the original patent. The original and reissue patents are for the same invention where the latter fully describes and claims the very invention intended to be secured by the original patent and describes and claims only those things which were embraced in that invention and where it is not merely suggested in the original but constitutes a part or portion of that invention. The required intention does not appear if the additional matter covered by the reissue is not disclosed in the original patent. It is not enough that an invention might have been claimed in the original patent because it was suggested or indicated in the specification. U. S. Industrial Chemicals v. Carbide and Carbon Chemicals Corp., 315 U.S. 668, 62 S.Ct. 839, 86 L. Ed. 1105; Leishman v. Associated Wholesale Electric Co., 9 Cir., 137 F.2d 722, cert. denied, 320 U.S. 794, 64 S.Ct. 262, 88 L.Ed. 478. The entire disclosure of the original patent, not just the claims, must be considered in determining what the patentee intended to claim and what

invention the patent discloses. Application of Handel, C.C.P.A., 312 F.2d 943.

 Considering the entire disclosure of the original Bender patent, we agree with the trial court's findings that the subject matter of the reissue claims in suit was "explicitly disclosed and taught but was not claimed" in the original patent and the "invention covered by said reissue claims in issue is the same invention as disclosed by the original patent." (199 F.Supp. at 380) It clearly appears from the face of the original patent that what is covered in the reissue was disclosed and intended to have been covered and secured by the original patent. Claims 7 and 8 in the original application are broad enough to include the basic concept of the reissue claims and the objects of the invention, as set forth in the original application, certainly disclose the subject matter contained in the reissue claims.

 McCullough's next contention is that, if the original application and patent were intended to cover and disclose the subject matter of the reissue claims, there was an intentional cancellation of the claims directed thereto, i. e., claims 7 and 8, and therefore the subject matter of those claims may not be recaptured in a reissue patent. A reissue patent is void if the matter covered by the reissue claims was intentionally omitted or abandoned by the patentee during the course of his application for the original patent or, in other words, in a situation where no error through inadvertence, accident or mistake exists. Altoona Publix Theatres v. American Tri-Ergon Corp., 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005; Dobson v. Lees, 137 U.S. 258, 11 S.Ct. 71, 34 L.Ed. 652. But this very same question was raised in the interference proceeding in the Patent Office and again by the Patent Examiner in the course of the ex parte proceedings on the reissue application. In both instances the ruling was in favor of Bender. Under these circumstances, we are bound by the rule laid down in Topliff v. Topliff, 145 U.S. 156, 171, 12 S.Ct. 825, 831,

36 L.Ed. 658, that " * * * this court will not review the decision of the commissioner upon the question of inadvertence, accident, or mistake, unless the matter is manifest from the record * * *." Moreover, the lower court found there was no evidence that Bender either approved or authorized the cancellation of original claims 7 and 8 and the defenses of lack of inadvertence, accident or mistake were not supported by any probative evidence. (199 F.Supp. at 380–381) We are also bound by these findings of fact unless they are clearly erroneous. Maytag Company v. Murray Corporation of America, 6 Cir., 318 F.2d 79; Noe v. Smith, 5 Cir., 300 F.2d 430. The record in the case clearly supports the findings of both the Patent Office and the trial court.

Lastly, McCullough contends that the Bender Reissue Patent is invalid over the prior art and relies upon the disclosures made in the Ambronn textbook. The Ambronn publication was considered by the Patent Office and, as the trial court found, it neither discloses nor teaches the use of a Geiger counter or any other type of radiation detector which produces an electrical signal. It discloses only the use of an electroscope, which provides an optical indication and is not suitable for use in radioactivity well logging.

■ The ultimate question of the validity of a patent is, of course, one of law for the court to decide. Mott Corporation v. Sunflower Industries, Inc., 10 Cir., 314 F.2d 872. We agree with the trial court that the Bender Reissue Patent is valid.

### Fearon Patent

The Fearon Patent is for a "Well Logging Method and Device" and the claimed invention relates to " * * * a method of and apparatus for conducting investigations inside of bore or drill holes * * * and renders it possible to identify and locate various formations traversed by such holes * * *." It was issued to WSI on January 12, 1943. The claims in issue describe a process and apparatus for exploring formations traversed by cased drill holes and for investigating the physical properties of such formations to thereby determine the depths at which the valuable or oil bearing strata are located and at which the casing should be perforated in order to produce oil or gas. The asserted inventive feature of this patent is the providing of a source of neutrons for the purpose of bombarding the formations outside of and around the well casing and thereby determining from the resulting radiation reactions whether a particular formation, which could contain fluid such as oil or water, does contain any such fluid. Thus, Fearon teaches the lowering of a source of neutrons into a well and an apparatus for utilizing the neutrons so produced to bombard the formations surrounding the well and for measuring the resulting radiations passing from the formation to the subsurface tool.

The Fearon instrument is a housing or cylinder which is lowered into the well by a cable. Inside the housing or cylinder is an ionization chamber, which is connected to a circuit that contains an amplifier and conductors and leads to the surface of the ground. A quantity of radioactive material which, in one of its forms, emits neutrons is located below the ionization chamber. The ionization chamber contains a cylindrical outer electrode and a central wire electrode. It is filled with an inert gas, such as nitrogen, and the gas is under pressure. As the tool is lowered inside the well casing, the radioactive material bombards the casing and the surrounding earth formations with neutrons. This causes a radiation reaction in the earth formations and the radiation reactions are detected by the ionization chamber The signals so detected are transmitted to the surface where, by means of a mechanical device, a recording or log is made in correlation with the depth. The ionization chamber produces a continuous electrical current rather than pulses and the continuous current is a measure

of the average energy flux impinging on the chamber.

McCullough contends that this patent is invalid over the prior art, i. e., Bender, because the only difference between the two is the substitution of a neutron source of radiation in Fearon for the X-ray or gamma ray source of Bender. The argument is that both sources were well known in the art and, hence, no invention could be claimed for such a substitution. It is based upon the well-recognized doctrine that the mere substitution of equivalents which do substantially the same thing in the same way, even though better results may be produced, is not such an invention as will sustain a patent. Dow Chemical Company v. Halliburton Oil Well Cementing Company, 324 U.S. 320, 65 S.Ct. 647, 89 L.Ed. 973. The question of equivalency is one of fact and it must be determined against the context of the patent, the prior art and the particular circumstances of the case and consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients and the function it is intended to perform. Graver Tank Co. v. Linde Air Products Co., 339 U.S. 605, 609, 70 S.Ct. 854, 94 L.Ed. 1097; Application of Ruff, 256 F.2d 590, 45 CCPA 1037.

The lower court found and the evidence confirms: While the well logs are substantially the same regardless of whether the radiation detector used is a Geiger counter, an ionization chamber or a scintillation counter, still the gamma ray log of Bender and the neutron log of Fearon are quite dissimilar in that a gamma ray log generally indicates formation density and a neutron log indicates porosity of the formation; the neutron log is a new and useful result never before obtained prior to Fearon; and there was an urgent need for a log which would complement Bender by giving an indication as to porosity and possible oil content of the inaccessible subsurface formations. The lower court concluded that the Fearon claims in issue were not obvious, but were the result of invention and were not anticipated by, but displayed substantial inventive advance over the prior art. (199 F.Supp. 381–383, 397) We are bound by those findings on the factual issues and agree with the court's conclusions. Accordingly, we hold that the Fearon Patent is valid.

### Swift Patent

This patent is entitled "Casing Collar Locator" and the invention " * * * relates to the art of well logging and more especially to apparatus adapted to simultaneously log a well and record the position relative to the well log of markers fixed along the depth of the well bore." The patent was issued to WSI on May 29, 1951. It recites that the usual method of determining depth by measuring, at the surface, the amount of cable lowered into the well was inaccurate for various reasons, including cable stretch; but that accurate indications of depth could be obtained " * * * if the well surveying device is so constructed that it not only performs the usual well surveying function, but also generates an appropriate signal each time that it passes one of a series of markers already placed at fixed depths in the well. Such markers are preferably the junctions between the sections of the well casing. * * * " It also recites that " * * if a magnetic field is created in the well bore and caused to be of such a configuration as to extend into the surrounding casing, and this field is lowered down the well bore, it will remain substantially unchanged except when it passes a junction between two casing sections * * * " and the signal which results from the change as a junction is passed " * * may then be used to determine or calibrate the depth scale against which the primary measurements are recorded."

The claims in issue describe a method and apparatus for simultaneously identifying and measuring the radiation signals emanating from the earth formations surrounding the well casing and obtaining signals indicating that the tool has passed a casing junction or collar.

The signals are then combined and transmitted to the surface where they are recorded to provide a log in which the radiation measurements are accurately correlated with depth. Thus, the Swift patent discloses a combination of a radiation detecting system with a "casing collar locator" in which the radiation signals and casing collar signals are electrically combined and subsequently recorded on a log to indicate the type of earth formation that may be present at a particular depth in the well as indicated by the location of the casing collars. The resulting log is essentially different from, and more accurate than, a radiation log wherein depths are determined by measurements made at the surface. The casing collar locator utilizes a magnetic field, the configuration of which is broken or changed when the locator passes a casing collar thereby producing the casing collar signals.

The lower court found and determined that: The problem of accurate depth measurements in radioactivity well logging was " * * * first solved for cased wells by the invention of the Swift Patent which met with immediate and substantial commercial success"; the casing collar signals made by the Swift method and apparatus at the time and place of the radiation measurements are primary depth measurements, the use of which produces a log essentially different from a radiation log where depth measurements are determined by secondary measurements made at the surface; the Swift Patent is a new combination of elements which produces a new and useful result and is not a mere aggregation of elements; and the Swift device is of great utility and value, it was not obvious but is the result of invention and it is not anticipated by, but displays substantial inventive advance over, the prior art. (199 F.Supp. at 385–387)

McCullough directly attacks these findings as being manifestly erroneous and asserts that the problem of accuracy of depth measurements had already been solved and was disclosed in the prior art at the time Swift's application was filed. It is argued that Swift is invalid over the prior art [4] because (a) casing collar locators and radioactivity formation logging are old and had been disclosed in the prior art relied upon and Swift does not amount to a new combination of these elements which produces a new and useful result, but rather is a mere aggregation and, as such, unpatentable, (b) it does not meet the standard of invention required for a patent, and (c) it does not possess the element of novelty. To demonstrate its argument, McCullough separates the elements of the disclosure and claims of the Swift patent, as set forth in the court's findings, and shows where each of those elements may be found or are disclosed in the prior knowledge or use, patents and printed publications that make up the prior art.

WSI does not deny that the individual elements are old in the art, but does argue that the combination covered by the Swift claims in issue is new and patentable. It argues that those claims may not be challenged by dissecting them and taking up the parts one at a time, but must be looked at as a whole and when this is done it becomes clear the trial court correctly found a new combination unknown in the prior art. It points out, and correctly so, that Swift was the first to utilize casing collar signals for the

4. The prior art relied upon by McCullough is the following: The Lane-Wells "feeler" type of collar locator; the Russell Patent, No. 2,320,890, issued June 1, 1943; the Ennis Patent, No. 2,228,623, issued January 14, 1941; the Doll Patent, No. 2,476,137, issued July 12, 1949; the Castel Patent, No. 2,459,499, issued January 18, 1949; prior public use by Schlumberger of a "locating radioactive marker"; and the Stratagraph electric logging device. However, the Russell Patent, while attached as an exhibit to the complaint, was not introduced into evidence and is not a part of the printed record. It is therefore not properly before us and will not be considered in our disposition of the cases. In any event, an examination of the patent shows that it is of little, or no, help to McCullough.

purpose of making primary depth measurements separately from, but at the same time and place as, radioactivity measurements as distinguished from secondary measurements made at the surface. It may fairly be stated that none of the items of prior art relied upon by McCullough, either individually or collectively, disclose such a method or apparatus. It is true that Ennis discloses a combination of a perforator gun and a magnetic casing collar locator but it does not show a combination of radioactivity well logging and casing collar locator. It is also true that the Schlumberger prior use discloses a casing collar locator and a Geiger counter but the collar locator is not magnetic and the Geiger counter is used to locate a radioactive bullet placed in the well before it was cased rather than to detect radioactivity from the earth's formations. The Stratagraph uses a single detector as distinguished from the combination of a collar locator and a Geiger counter or ionization chamber and, as a result, it did not make a reliable log and never achieved any substantial commercial success or acceptance. Thus, while the prior art does disclose the two elements of casing collar locator and radioactivity well logging, it does not disclose any combination of those two elements so as to produce the result achieved by Swift, namely, the combining of a magnetic casing collar locator and radioactivity well logging and the providing of a transmitter system so that casing collar signals and radiation signals can be transmitted and recorded to show earth formation in correlation with depth.

It is universally held that a mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than previously performed or produced by them, is not a patentable invention. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162; Admiral Corporation v. Zenith Radio Corp., 10 Cir., 296 F.2d 708; Consolidated Electro. Corp. v. Mid-western Instruments, 10 Cir., 260 F.2d 811. The test of whether a particular patent is a mere aggregation and invalid or a combination and valid has been variously stated. Generally, where elements old in the art are united in such a way that a new and useful result is secured or an old result is attained in a more facile, economical and efficient manner, there is a patentable combination. Bewal, Inc. v. Minnesota Mining and Mfg. Co., 10 Cir., 292 F.2d 159; Oliver United Filters v. Silver, 10 Cir., 206 F. 2d 658, cert. denied, 346 U.S. 923, 74 S.Ct. 308, 98 L.Ed. 416.

We think the Swift patent is a combination, rather than an aggregation, of old elements. The record sustains the trial court's factual determination that Swift is a new combination of old elements that produces a new and useful result and was not obvious to one skilled in the art. The log produced by the Swift method and apparatus is not only different from, and more accurate than, a radiation log but it also utilizes a casing collar to record depth measurements simultaneously with the recording of radiation formation signals. This is a result that no other prior invention had ever reached. The fact that the Swift combination worked and gave an accurate depth measurement, while none of the prior devices had, is an indication of inventiveness. Twentier's Research, Inc. v. Hollister Incorporated, 9 Cir., 319 F.2d 898. We conclude that the patent in suit is a valid combination of elements old in the art and amounts to invention and that it possesses the requisite element of novelty under the test set forth in Mott Corporation v. Sunflower Industries, Inc., supra, 314 F.2d at 879.

McCullough next contends that the method and apparatus disclosed in Swift was in public use for more than a year prior to the filing of the application for patent and, therefore, it is invalid under 35 U.S.C.A. § 102(b). The device was first conceived in May, 1944, and the application for patent was not filed until March, 1946. Section 102(b) provides that a person shall not be en-

titled to a patent if his invention has been in public use for more than one year prior to the application. Sears, Roebuck & Co. v. Jones, supra. A single public use is sufficient to render a patent invalid. Consolidated Fruit Jar Co. v. Wright, 94 U.S. 92, 24 L.Ed. 68. But not every use is a public use within the meaning of the statute. Hobbs v. Wisconsin Power & Light Company, 7 Cir., 250 F.2d 100, cert. denied, 356 U.S. 932, 78 S.Ct. 774, 2 L.Ed.2d 762. The good faith use of the device or apparatus for experimental purposes is not a public use within the intent and meaning of the statute. Merrill v. Builders Ornamental Iron Co., 10 Cir., 197 F.2d 16; Nicholson v. Carl W. Mullis Engineering and Mfg. Co., 4 Cir., 315 F.2d 532, cert. denied, 375 U.S. 828, 84 S.Ct. 72, 11 L.Ed.2d 60. During an experimental period, the inventor may freely use his device " * * * for the purpose of testing the machine * * * ", Smith and Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 256, 8 S.Ct. 122, 126, 31 L.Ed. 141, or " * * * in order to bring the invention to perfection * * * ", Elizabeth v. American Nicholson Pavement Co., 97 U.S. 126, 134, 24 L.Ed. 1000, and the statutory period does not commence to run.

 Public use is defined as " * * * [t]he ordinary use of a machine or the practice of a process in a factory in the usual course of producing articles for commercial purposes * * ." Electric Storage Battery Co. v. Shimadzu, 307 U.S. 5, 20, 59 S.Ct. 675, 684, 83 L.Ed. 1071. The burden is upon the one asserting prior public use to establish it by clear, cogent and satisfactory proof to remove all reasonable doubt thereof; but when a use is shown that has occurred prior to the statutory period, it is incumbent upon the patentee to show that such use was experimental only. Merrill v. Builders Ornamental Iron Co., supra; Linville v. Milberger, 10 Cir., 34 F.2d 386. The issue of whether a use of the device is experimental or public is one of fact. Willamette-Hyster Co. v. Pacific Car & Foundry Co., 9 Cir., 122 F.2d 492; General Electric Co. v. Minneapolis-Honeywell R. Co., 2 Cir., 118 F.2d 278. And, the trial court's finding in this respect is binding upon the Court of Appeals unless it is clearly erroneous. Webb v. Frisch, 7 Cir., 111 F.2d 887; Cold Metal Process Company v. Republic Steel Corp., 6 Cir., 233 F.2d 828, cert. denied, 352 U.S. 891, 77 S.Ct. 128, 1 L.Ed.2d 86.

 The trial court found that all uses made of the invention prior to the date the application was filed were experimental, were carried on in good faith for such purposes and were not prior public uses of the invention. (199 F. Supp. at 396–397) It is sufficient here to say we agree with the trial court that the repeated references, as disclosed in the documentary evidence and made during the period from 1944 to March, 1945, to the tool as being experimental in character "should be accorded great weight" in determining whether the use was experimental and carried on in good faith. The initial tests were commenced in 1944 and carried on until March 9, 1945, with regular reports being submitted during that time. These reports show various changes were made in the tool from time to time. The design and circuitry of the casing collar locator were kept secret and the locator itself was encased in a housing and not shown to outsiders. This evidence supports the finding that the use of the tool was made in good faith for experimental purposes and that there was no prior public use of the tool for more than a year before the application.

 McCullough's next contention is that Swift is invalid because it was obtained by fraud and misrepresentations to the Patent Office on the part of the patentee. This court has held that relief will be denied in a patent infringement suit to a " * * * patentee who has behaved unethically in his dealings with the Patent Office in connection with a patent in suit. * * * " Admiral Corporation v. Zenith Radio Corp., supra, 296 F.2d at 716. McCullough had the burden of proving fraud by clear and convincing evidence. Armour & Co. v. Wilson & Co., 7 Cir., 274 F.2d 143;

Triumph Hosiery Mills, Inc. v. Alamance Industries, Inc., 4 Cir., 299 F.2d 793, cert. denied, 370 U.S. 924, 82 S.Ct. 1566, 8 L.Ed.2d 504. It has not met that burden in this case. The record shows that the alleged misrepresentations relied upon by McCullough were not, in fact, misrepresentations at all and that there was no concealment of pertinent prior art.

■■■■■■ McCullough's remaining contentions that the patent in suit is invalid because the descriptions and drawings contained therein are fatally defective under 35 U.S.C.A. § 112 and because it is based upon alleged new matter, as disclosed in a drawing designated as Figure 4, in violation of 35 U.S.C.A. § 132, are also without merit. Section 112 provides that the patent " * * * specification shall contain a written description of the invention, and of the manner and process of making and using it * * * "; but it does not require a description of all variations that might suggest themselves to one versed in the art. Sears, Roebuck & Co. v. Jones, supra. The invention may be described together with that mode which is conceived to be the best for putting it into practical use and where that has been done the patent is not confined to the precise mode outlined. Chicago Pneumatic Tool Co. v. Hughes Tool Co., 10 Cir., 97 F.2d 945, 946, cert. denied, 305 U.S. 643, 59 S.Ct. 146, 83 L.Ed. 415; Pursche v. Atlas Scraper and Engineering Co., 9 Cir., 300 F.2d 467, cert. denied, 371 U.S. 911, 83 S.Ct. 251, 9 L.Ed.2d 170. The patent in suit clearly meets this test and it is obvious from an examination of the file wrapper that the original application contains a description of everything disclosed in Figure 4.

■■■■ We have no difficulty in concluding that the Swift Patent is valid in all respects.

### Pringle Patent

This patent was issued on August 10, 1954, and is entitled "Improvements in Radiation Detectors". Among others, the objects of the invention are to provide: (1) " * * * [A] device * * *

which, due to the capacity thereof to record energies of gamma rays, makes it particularly suitable for use in the identification of radioactive minerals, liquids, gases and other substances."; (2) " * * a scintillation spectrometer particularly suitable for use in bore holes whereby continuous records of the intensities and energies of the naturally occurring and neutron capture gamma rays may be obtained, which permits a determination to be made of the location and nature of firstly, naturally occurring radioactivity, and secondly the physical and chemical structure of the strata. * * * "; and (3) a device which includes a " * * * flip-flop circuit for operating a counting-rate meter. * * * " By use of this circuit, pulses of less than any desired amplitude may be discriminated against and rejected. It is possible to determine the size distribution of the pulses due to scintillations and, hence, the energies of the gamma rays involved. The record shows that the claims as set forth in the original application were rejected on the ground that they were unpatentable over the prior art. In response to such rejection, the applicants amended their application by, among other things, adding the following: " * * * it is necessary to use a single crystal having a mass not less than 10 grams in order to measure most accurately the energies of the gamma rays." They were successful in their arguments and the patent was duly issued.

The claims in issue describe a specialized form of radioactivity well logging, known as "spectral logging", in which the energies of gamma rays emanating from the earth's formations are measured to identify the type of formation found at a particular depth and in which a discriminator is used to separate out and reject signals derived from gamma rays having less than specified energies. The gamma rays are detected and their energies measured by a scintillation counter, which is located in the lower part of the housing that is lowered into the well by a cable and which has three basic elements: A phosphor which emits

brief flashes of light, i. e., scintillations, when exposed to radiation; a photo-sensitive element, i. e., photo-multiplying tube, to receive the scintillations and convert them into electronic pulses; and an indicator means, usually in the form of a counting rate meter, that is connected to the photo-sensitive element and used to receive and send on the pulses or characteristics of the gamma rays.

The phosphor in this patent is a single unit crystal, having a mass of at least 10 grams, and is made of sodium iodide activated by thallium. It must be protected from the effect of moisture in the atmosphere and this is accomplished by covering it with a protective shield, which also serves the purpose of reflecting any light emerging from parts of the crystal not adjacent to the photo-sensitive element back towards the end of that element. The crystal scintillates or emits flashes of light as a result of its absorbing the energy of gamma rays when it is subjected to radiation bombardment. Each of the gamma rays detected by the crystal causes a separate scintillation and they are of different energies depending upon the elements of the formation from which they originate. For example, the energy of the gamma rays emitted by thorium is different from that of gamma rays produced by uranium and since each element, such as uranium or thorium, has its own particular gamma ray energy, it can be identified by measuring the energy of the gamma ray detected by the crystal. In addition to detecting the gamma rays, the crystal also converts them into light flashes of proportional energy, which are then received by the photo-sensitive element.

The photo-sensitive element is a photo-multiplying tube which, as it receives the scintillations or light flashes, converts each of them into an electronic or voltage pulse. This pulse has a height or voltage in direct proportion to the light flash or scintillation and, thus, is proportional to the amount of energy contained by the original gamma ray. The electronic pulses then flow through an electric cir-

cuit to an amplifier, contained in the tube, where each of the electronic pulses is proportionally increased in voltage so that it may flow through an electric circuit located inside of the cable used to lower the tool into the well and, thus, to the surface of the ground. At the surface, the pulses pass through an amplifier, a discriminator and a counting rate meter and are then recorded in the form of a log.

The indicator means is a counting-rate meter and its function is to separately count the electronic pulses of each size. An essential part of the indicator is a discriminator which acts as a threshold device or gate to screen out and reject spurious pulses generated by such things as noise in the photo-multiplying tube and elsewhere in the counter. By its use, pulses of less than any desired height or amplitude are eliminated and only those of a predetermined amplitude are passed and ultimately recorded. In other words, the function of the discriminator is to separate out all voltage pulses below a preselected energy level and reject them while at the same time allowing all pulses above that level to pass on for recording. There are two kinds of discriminators pertinent to this patent. An integral discriminator passes all electronic pulses larger than a predetermined level and screens out the rest. A differential discriminator is comprised of two integral discriminators so arranged as to select all electronic pulses larger than a first predetermined level and smaller than a second similar level or, stated in another way, it selects and permits the counting of electronic pulses within a certain band.

The McCullough tool, manufactured under this patent by exclusive license, therefore contains a scintillation counter, rather than a Geiger counter or ionization chamber, and also a casing collar locator to establish depth. It functions in this way: As the tool is lowered into the well, the gamma rays emitted from the particular earth formation present are detected by the crystal and converted into light flashes or scintillations; the scintillations are received by the photo-

multiplier and converted into electronic pulses; the electronic pulses are amplified and sent out through an electronic circuit to a discriminator where they are rejected or passed through; and the electronic pulses passed through are recorded to form a log of the formations encountered. The composition of the formation at any designated depth can be determined because the gamma rays emitted by the type of material in the formation contain or possess a certain energy which is measured by the crystal and kept uniform throughout the ensuing process until recorded. Unlike the tool described in Swift, which has only one recording means to record signals originating in a single formation recorder, the McCullough tool sends two separate sets of signals to the surface where they are recorded on two recorders. This is because there is one set of signals for the casing collar locator that is sent through one circuit and another set of signals from the formation detector that is sent through another circuit.

The asserted inventive feature of the patent in suit is an alleged new combination of elements having a new mode of operation, which is said to be unique in the following respects: It is the first device to accomplish the identification of chemical elements contained in bulk material such as earth formations so that the presence of different unknown chemical elements can be detected; it is the first to identify chemical elements in bulk material by measuring the precise energies of the gamma rays emitted therefrom and discarding undesirable gamma ray energies which interfere with efficient and effective determinations; and it is the first to conceive and develop a single, thallium activated, sodium iodide crystal which is transparent to its own scintillations and of sufficient size to completely absorb the energy of detected gamma rays.

The trial court concluded that the claims in issue are valid but " * * * are limited to scintillation counter apparatus for the determination of energy characteristics of gamma rays by analyzing the pulses generated by the gamma rays to determine energy characteristics either by variation of an integral discriminator setting or by use of a differential discriminator." (199 F.Supp. at 388) Both parties have appealed from this determination. McCullough claims that its tool manufactured in accordance with the patent under an exclusive license is a new combination of elements and produces a new result never before attained and therefore the claims are valid in their entirety. Since the argument in this respect furnishes the basis for McCullough's claim of infringement, it will be more convenient to discuss it in connection with that issue.

WSI contends that the Pringle Patent is invalid, even when the claims in issue are limited to a scintillation spectrometer, because it lacks novelty and invention over the prior art. It asserts that everything covered by Pringle was known and published in the art before the patentees made their alleged invention. In the court below WSI relied upon a total of 165 references consisting of 47 prior patents and 118 technical articles or publications. However, in connection with this appeal it apparently relies upon only two of the patents [5] and several of the printed publications.[6] None of these publications were cited by the Patent Office and each and every one of them deals with scintillation counters in one way or another. All of such publications are reports on laboratory experiments which were not conducted with a view to producing an instrument suitable

5. They are Patent No. Re. 24,226 (hereinafter referred to as the Fearon Reissue Patent) and Patent No. 2,549,176 (hereinafter referred to as the Crumrine Patent).

6. They are the following articles published on the dates indicated: Deutsch—December 1, 1947; Moon—May 15, 1948; Bell—June 1, 1948; Hofstadter—July 1, 1948 and July 22, 1948; Morton and Mitchell—December, 1948; and the Oak Ridge Symposium—October, 1949 and October 21, 1949.

398

for logging an oil well by measuring energies of gamma rays to determine the type of formation producing them. In short, none of the prior art references, including the patents, are concerned with the problem of identifying chemical elements mixed in bulk, such as formations of the earth, by measuring the energies of gamma rays emitted therefrom. Nor do any of them teach the using of a scintillation counter combined with a discriminator, for measuring not only the intensities of gamma rays but also their energies and the rejection of pulses above or below a predetermined level so as to provide a means of geophysical exploration and the making of neutron or radioactivity well logs.

We must first determine whether the claimed invention lacks the element of novelty or is anticipated by the prior patents and printed publications. In this connection, this court has held that the burden is upon the one asserting anticipation to sustain it by clear and convincing evidence and a patent is to be measured as anticipatory, not by what might be made out of it, but by what it clearly and definitely discloses. Mott Corporation v. Sunflower Industries, Inc., supra. In order for a prior patent to anticipate an invention, it is necessary that all of the elements of the invention or their equivalents be found in one single structure or description, where they do substantially the same work in substantially the same way. Preformed Line Products Co. v. Fanner Mfg. Co., 6 Cir., 328 F.2d 265, cert. denied, 379 U.S. 846, 85 S.Ct. 56, 13 L.Ed. 2d 51. In order for a prior printed publication to anticipate an invention the description contained therein must disclose the complete and operative invention in such full, clear and exact terms as to enable any person skilled in the art to which it pertains to practice the invention to the same extent as he would be enabled to do if the information were derived from a prior patent. Eames v. Andrews, 122 U.S. 40, 7 S.Ct. 1073, 30 L.Ed. 1064; 40 Am.Jur., Patents, § 37, p. 554. In short, a printed publication is to be tested by the same rules as those applicable to a prior patent. 69 C.J.S. Patents § 41, p. 232. Anticipation is strictly a technical defense and unless all of the same elements are found in exactly the same situation and united in the same way to perform an identical function, there is no anticipation. National Lead Company v. Western Lead Products Company, 9 Cir., 324 F.2d 539; Stauffer v. Slenderella Systems of California, 9 Cir., 254 F.2d 127.

It is clear that the prior patents and publications relied upon by WSI do not meet the standards required of them to constitute anticipation. No single patent or publication comes anywhere near to a disclosure of the elements of the Pringle Patent. None of them contain a description in "such full, clear and exact terms as to enable any person skilled in the art to which it pertains to practice the invention to the same extent as he would be enabled to do if the information were derived from a prior patent." The very fact that WSI found it necessary to rely upon 165 prior references is in itself an indication of the weakness of the claim that Pringle is lacking in novelty. See Reynolds v. Whitin Mach. Works, 4 Cir., 167 F.2d 78, 83, 84, cert. denied, 334 U.S. 844, 68 S.Ct. 1513, 92 L.Ed. 1768.

It is suggested, however, that Pringle is nothing more than an aggregation of elements old in the art and as such it comes within the rules of Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra. Of course, to establish anticipation in such a situation, it is not necessary that all of the elements be found in a single patent or publication. It is enough if the whole of the prior art considered together discloses all of the claimed elements and that no new functional relationship arises from their combination. Doran Coffee Roasting Co. v. Wyott Manufacturing Co., 10 Cir., 267 F.2d 200; Hollywood-Maxwell Co. v. Street's of Tulsa, 10 Cir., 183 F.2d 261. In order to anticipate a patent for a combination, the prior art must disclose all of the elements of such

combination or their mechanical equivalents, functioning in substantially the same way to produce substantially the same result. Williams Iron Works Co. v. Hughes Tool Co., 10 Cir., 109 F.2d 500. Rudimentary or unsuccessful experiments with isolated elements of a combination do not anticipate an invention which successfully combines those elements. Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721; Stearns v. Tinker & Rasor, 9 Cir., 220 F.2d 49, cert. denied, 350 U.S. 830, 76 S.Ct. 62, 100 L.Ed. 741; G. H. Packwood Mfg. Co. v. St. Louis Janitor Supply Co., 8 Cir., 115 F.2d 958. And, "* * * whoever finally perfects and improves a device and renders it capable of practical, useful and effective operation is entitled to a patent although others had the idea and made experiments toward putting it into practice. * * *" Montgomery Ward & Co. v. Clair, 8 Cir., 123 F.2d 878, 881.

These rules are controlling here. The prior printed publications were all concerned with experiments which, if they were not rudimentary or unsuccessful experiments of isolated elements of the combination disclosed in Pringle, certainly did not perfect and improve the device embodied in Pringle or its equivalent or render it capable of practical, useful and effective operation. Thus, the prior art, considered together as a whole, does not anticipate the Pringle Patent, which did put the idea into practice. Pringle must therefore be considered to be a valid combination unless, as WSI asserts, it would have been obvious to a person having ordinary skill in the art.

■■ The general rule is that before a device may be patentable, the improvement over the prior art must involve more than would be obvious to one of ordinary skill in the art. Admiral Corporation v. Zenith Radio Corp., supra; Philip Sitton Septic Tank Company v. Honer, 10 Cir., 274 F.2d 811; E. J. Brooks Company v. Stoffel Seals Corporation, 2 Cir., 266 F.2d 841, cert. denied, 361 U.S. 883, 80 S.Ct. 154, 4 L.Ed.2d 119. If those skilled in the art are working in a given field and have failed after repeated efforts to discover a particular new and useful improvement, the person who first makes the discovery does more than make the obvious improvement which would suggest itself to a mechanic skilled in the art, and is entitled to protection as an inventor. Bewal, Inc. v. Minnesota Mining and Mfg. Co., 10 Cir., 292 F.2d 159; Williams Iron Works Co. v. Hughes Tool Co., supra; Steiner Sales Co. v. Schwartz Sales Co., 10 Cir., 98 F.2d 999, cert. denied, 305 U.S. 662, 59 S.Ct. 364, 83 L.Ed. 430; G. H. Packwood Mfg. Co. v. St. Louis Janitor Supply Co., supra.

We think that, when measured by the foregoing rules, the Pringle device, as limited by the trial court, is not only novel but was not obvious and constitutes invention as well. The record indicates that numerous efforts were made to discover the new and useful improvement embodied in the Pringle Patent and that the Pringle device produced a log correlating porosity with depth which was far superior to any other on the market at that time. This result, we believe, constitutes more than the exercise of mere mechanical skill.

■ WSI's final contention is that if the 10 gram size of the crystal is critical, then claims 1, 2, 8, 13, 14, 20, 21 and 22 of the patent in suit are invalid because they are based upon "new matter" in contravention of 35 U.S.C.A. § 132 and if the crystal size is not critical, then such claims are invalid because they are based upon a mere change in degree or proportion in violation of the rule laid down in Powers-Kennedy Contracting Corp. v. Concrete M. & C. Co., 282 U.S. 175, 185, 51 S.Ct. 95, 75 L.Ed. 278, and other similar cases. Little need be said on this point. The complete answer to it is that it is not the size or weight of the crystal that contributes patentability to the claimed invention. It is the method and apparatus for analyzing the pulses generated by gamma rays to determine energy characteristics and the recording thereof either by variation of an integral discriminator or by use of a differential discriminator that makes this invention patentable. We are

convinced that the patent in suit is valid when limited as specified by the trial court.

### Infringement of Bender Reissue and Fearon Patents

The questions of infringement with respect to the Bender Reissue and Fearon Patents are closely related and may be considered together. As to Bender, the trial court found: The natural gamma ray logging apparatus and method utilized by McCullough includes each and every step recited in the Bender claims in issue and includes each and every element of the Bender apparatus and method; each of the Bender claims in issue reads directly on the McCullough apparatus and method; McCullough accomplishes the same result in substantially the same way as Bender and is the full equivalent thereof; and therefore each of the Bender claims in issue was infringed by McCullough. (199 F.Supp. at page 379) The court made similar findings as to Fearon (199 F.Supp. at page 382) and in connection with both patents found: Geiger counters, ionization chambers and scintillation counters are all radiation detectors sensitive to gamma rays; they all accomplish the same result in substantially the same manner; they all detect radiation by producing electrical signals indicative thereof; it is a matter of choice as to which one of them is used; the resulting logs are substantially the same regardless of the type of detector used; the scintillation counter used by McCullough performs no different function than that performed by the Geiger counter of Bender in natural gamma ray logging or by the ionization chamber of Fearon in neutron logging, the modes of operation are the same and they are full equivalents; and the claims in issue of each patent are not limited to any specific type of radiation detector. (199 F.Supp. at pages 379–380 and pages 382–383) The court also found that while a scintillation counter may be used to determine the energy spectrum of natural gamma rays or of radiations resulting from neu-

tron bombardment, the energy spectrum principle was not utilized by McCullough in its conventional gamma ray or neutron logging operations. (199 F.Supp. at 380 and 383)

McCullough contends that these findings are erroneous and that the two patents in suit are not infringed because the apparatus and method used by it in each type of well logging equipment consists of a different combination of elements which has a different mode of operation and produces a different result. This contention is based upon the fact the McCullough apparatus and method uses a scintillation counter as a radiation detector, which is capable of measuring both intensity and energy of a gamma ray, whereas Bender uses a Geiger counter and Fearon uses an ionization chamber, neither of which is capable of measuring energy. As McCullough points out, Bender is comprised of a Geiger counter, an amplifier and a recorder. Fearon is made up of an ionization chamber, a direct current amplifier and a recording galvanometer. The McCullough tool consists of a sodium iodide crystal, a reflector shield, a photo-multiplying tube, a pulse lengthening circuit, a pulse amplifier, a discriminator and a counting-rate meter. As to mode of operation, a Geiger counter converts gamma rays directly into electronic pulses of the same size and all pulses are recorded. An ionization chamber converts gamma rays directly into a continuous current flow and only an average flow is recorded. A scintillation counter converts gamma rays into light flashes of proportional energy and the light flashes are in turn converted by the photo-multiplying tube into voltage pulses. It can be used so that only those voltage pulses of a preselected energy are recorded. In results produced, only by using a scintillation counter can pulses proportional to the energies of gamma rays be rejected as being below or above a predetermined level and thus be excluded from the log. None of these pulses can be excluded where a Geiger counter or an ionization chamber is used.

These are only a few of the asserted differences but they illustrate McCullough's argument.

However, it must be remembered that the Bender invention is an apparatus and method for natural gamma ray logging and not a Geiger counter. By the same token, the Fearon invention is not an ionization chamber but an apparatus and method for neutron logging. It must also be remembered that the court found that the energy measuring capability of the McCullough scintillation counter was not utilized by it in its conventional gamma ray and neutron logging operations. As a result, many of the obvious differences between Bender and Fearon, on the one hand, and McCullough, on the other, are not material here. The issue is whether the material differences are sufficient to preclude a finding of infringement.

 The question of infringement is one of fact and, upon review, the trial court's findings thereon will not be set aside unless they are clearly erroneous. Stilz v. United States, 269 U.S. 144, 46 S.Ct. 37, 70 L.Ed. 202; Hahn & Clay v. A. O. Smith Corporation, 5 Cir., 320 F.2d 166, cert. denied, 375 U.S. 944, 84 S.Ct. 351, 11 L.Ed.2d 274. Therefore, our power of review is limited to determining whether, under correct legal standards, the findings of infringement are supported by the record.

 In determining whether an accused device infringes a valid patent, resort must be had in the first instance to the words of the claims contained in the patent and if the accused device falls clearly and definitely within those claims, infringement is made out. Graver Tank Co. v. Linde Air Products Co., supra; Parmelee Pharmaceutical Company v. Zink, 8 Cir., 285 F.2d 465; Maytag Company v. Murray Corporation of America, 6 Cir., 318 F.2d 79. However, this is not conclusive as infringement is not a mere matter of words. Pursche v. Atlas Scraper and Engineering Co., supra; Nickerson v. Bearfoot Sole Company 6, Cir., 311 F.2d 858, cert. denied, 375 U.S. 815, 84 S.Ct. 48, 11 L.Ed.2d 50. The true test of infringement is whether the accused device and the device covered by the patent do the same work in substantially the same way to accomplish substantially the same result. Bewal, Inc. v. Minnesota Mining and Mfg. Co., supra; Jamco, Incorporated v. Carlson, 10 Cir., 274 F.2d 338; Jones v. Bodaness, 10 Cir., 189 F.2d 838; Williams Iron Works Co. v. Hughes Tool Co., supra.[7] Under the doctrine of equivalents, infringement may exist even though the two devices differ in name, form or shape. Graver Tank Co. v. Linde Air Products Co., supra. Equivalency must be determined against the context of the patent, the prior art and the particular circumstances of the case and complete identity for every purpose and in every respect is not required. Jones v. Bodaness, supra.

 A primary or pioneer patent, such as Bender, is to be given a broad and liberal construction and, also, a broad and liberal range of equivalence and it is not to be limited to the precise device and instrumentality disclosed. Mason Corporation v. Halliburton, 10 Cir., 118 F.2d 729; Priebe & Sons Co. v. Hunt, 8 Cir., 188 F.2d 880, cert. dismissed, 342 U.S. 801, 72 S.Ct. 92, 96 L.Ed. 607. A combination patent which constitutes a marked improvement in the art, such as Fearon, is entitled to a substantial range of equivalents. Skinner Bros. Belting Co. v. Oil Well Improvements Co., 10 Cir., 54 F.2d 896; Johns-Manville Corporation v. National Tank Seal Co., 10 Cir., 49 F.2d 142, cert. denied, 284 U.S. 654, 52 S.Ct. 33, 76 L.Ed. 555. And, of course, every element of a

7. This court said in Merrill v. Builders Ornamental Iron Co., 10 Cir., 197 F.2d 16, 20:

"* * * Infringement exists only when the accused apparatus or device and the disclosure of the patent in suit are substantially identical in mode of operation and results accomplished. An apparatus or device does not infringe unless it incorporates in its structure and operation the substance of the patent and produces substantially the same effect in substantially the same way as that taught in the patent. * * *"

combination patent is conclusively presumed to be essential and therefore every element, or its functional equivalent, must be found in the accused device or there is no infringement. Texas Co. v. Anderson-Prichard Refining Corporation, 10 Cir., 122 F.2d 829; Haynes Stellite Co. v. Osage Metal Co., 10 Cir., 110 F.2d 11.

Giving the two patents in suit the range of equivalents to which they are entitled, we think the accused McCullough devices not only read directly upon the Bender and Fearon claims, but they do the same work in substantially the same way to accomplish substantially the same result. It is true that there are differences in name, form and shape as between a Geiger counter, an ionization chamber and a scintillation counter. But, the energy measuring capability of the scintillation counter is not used in the accused devices and therefore all three of them do substantially the same thing, namely, measure the intensity of gamma ray radiations or neutrons. McCullough's own expert witness testified on cross-examination that Geiger counters, ionization chambers and scintillation counters all measure gamma rays and that the one chosen to be used depends upon the particular problem at hand. It is also true that for some purposes the scintillation counter is superior to the other two and that it performs the additional functions of converting gamma rays into light flashes and providing pulses rather than a continuous flow. But infringement cannot be avoided by the mere fact that the accused device is more or less efficient or performs additional functions. Johns-Manville Corporation v. National Tank Seal Co., supra. It is clear from the record that insofar as conventional gamma ray and neutron logs are concerned, there is no significant difference between the logs regardless of which type of radiation detector is used to produce them. The accused McCullough apparatus and method and the Bender apparatus and method do substantially the same work in gamma ray logging in substantially the same way to accomplish substantially the same result. This is also true as to McCullough and Fearon in neutron logging. We must therefore conclude that the court's findings of infringement with respect to the Bender Reissue and Fearon Patents are not clearly erroneous.

### Infringement of the Swift Patent

The trial court's findings with respect to infringement of the Swift Patent are as follows: The accused McCullough logging apparatus with casing collar locator, both structurally and functionally, is substantially the same as the combination disclosed in Swift; each and every element of the Swift claims in issue is employed in the McCullough device and is used in the same way to achieve the same result; each of those claims reads directly upon the McCullough device; and the Swift patent is infringed by the accused device. (199 F.Supp. at 386–387)

McCullough contends here, as it did at the trial, that its device does not infringe Swift because that device has a different combination of parts and a different mode of operation. In this connection, the lower court found, and the evidence confirms, that the Swift casing collar locator produces a surge of negative current every time it passes a casing collar, which surge interrupts the formation signals so that the latter drop to zero, and in the McCullough device there is no interruption of the radiation signals because continuous signals are provided from both the casing collar locator and the radiation detector. McCullough also points out that the Swift tool utilizes only one pen to record both the casing collar and radiation signals whereas the accused device uses two pens, one of which records casing collar signals and the other radiation signals, and argues that Swift is limited to a device in which the radiation signals are interrupted and in which only one pen is used to record the signals.

The trouble with this contention is that the claims are not so limited and the claims are the sole measure of

the grant. Aro Mfg. Co. v. Convertible Top Replacement Co., 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592. Moreover, it appears from the Swift file wrapper that at one time the system whereby the signals are interrupted was explicitly claimed but was cancelled, thus indicating that the interruption feature was not critical to the invention. And, the patent itself recites that a possible variation of the device is to use two pens for the purpose of recording the two sets of signals. In view of this, it is not surprising the court found that the interruption system was but one of several available means by which the radiation and casing collar signals could be transmitted and the Swift claims were not limited to that system and that none of the Swift claims were limited to a one pen recorder or a two pen recorder.

■ McCullough next asserts that Swift is limited to an interrupted signal system and one pen recorder by virtue of the doctrine of file-wrapper estoppel. However, the essence of the doctrine is that a patentee may not expand his allowed claims by interpretation to embrace features which he disclaimed in order to overcome objections by the Patent Office on the basis of prior art disclosures. Doran Coffee Roasting Co. v. Wyott Manufacturing Co., supra. It is not applicable where the patentee's difficulty results not from prior art similarities but from the wording and indefiniteness of the claims. Sears, Roebuck & Co. v. Jones, supra. In this case, the original claims upon which McCullough relies to invoke the doctrine were not rejected because they were unpatentable over the prior art. They were rejected on the formal grounds of being improper method claims and therefore file-wrapper estoppel is not applicable.

■ It is obvious from the record that the accused device does the same work in substantially the same way to accomplish substantially the same result as the device disclosed in Swift. Thus, the findings of infringement of the Swift Patent are not clearly erroneous.

*Infringement of the Pringle Patent*

The lower court found in connection with Pringle that a fixed integral discriminator used in conjunction with a scintillation counter having a single crystal of at least 10 grams does not infringe any of the valid Pringle claims in issue, as limited; that infringement requires the use of either a variable integral discriminator or a differential discriminator; that the accused WSI instruments which utilize a single fixed integral discriminator to measure the intensity of gamma rays above a fixed discrimination level did not infringe the Pringle claims; and that the Dresser "Chlorinilog" device and method, which comprises a conventional neutron-gamma ray log made with a scintillation counter at a given discrimination level and a second neutron-gamma ray log made with the scintillation counter at a different discrimination level, did infringe the Pringle claims in issue. (199 F.Supp. at 388–389)

■ McCullough contends that the WSI instruments which utilize a fixed integral discriminator infringe the Pringle Patent and that the court's finding to the contrary is erroneous as is the holding that the Pringle claims in issue are invalid unless limited to spectral logging. In support of this contention, McCullough argues that a single fixed integral discriminator can be used to measure the energy of gamma rays and the finding to the contrary is in error. Thus, it argues, the WSI instruments which utilize the single fixed integral discriminator do infringe the Pringle claims. Of course, McCullough's argument here completely overlooks the crucial point made by the lower court during the course of the trial. That point is that unless the Pringle claims in issue are limited in the manner specified, they are invalid over the prior art and an invalid patent cannot be infringed. Consolidated Electro. Corp. v. Midwestern Instruments, supra. When the claims in issue are limited as they must be in order to be valid over the prior art, the ac-

cused devices do not infringe those claims because they do not use either a variable integral discriminator or a differential discriminator.

■■■ WSI contends that the Dresser Chlorinilog operations do not infringe Pringle because they do not utilize a varying integral discriminator or a differential discriminator and they do not use a dual purpose shield, i. e., a shield to reflect and protect from moisture. Little need be said here. It is sufficient to say that the record clearly discloses the use of a variable integral discriminator in the Chlorinilog operations and that the Pringle claims are no more limited to a single shield for performing the dual function of moisture protection and reflection than the Swift claims are limited to an interrupted signals system. It is not the shield that is patented in Pringle. It is the method of logging that is patented. Beyond question, the Chlorinilog does substantially the same work as the apparatus and method disclosed in Pringle and in substantially the same way to accomplish substantially the same result. Infringement of the Pringle Patent, as the claims are limited, is therefore established.

### The Issue of Misuse

The record clearly establishes, and the parties do not dispute, that WSI misused its patents in certain respects over the years. The controversy centers around the lower court's holding that such misuse was discontinued and purged as of June 1, 1956. McCullough appeals from that holding and contends that there has been no purge and the misuse has never been discontinued. WSI has cross-appealed contending that the purge was effected as of April 1, 1954. The issues then are whether WSI effected a purge of its wrong-doing and, if so, when.

On June 11, 1940, WSI entered into its first written license agreement with Lane-Wells. At this time, Lane-Wells was engaged in the business of oil well servicing for hire and, among other logging operations, rendered radioactivity well logs from shortly after June 11, 1940, until its liquidation in 1958. Lane-Wells was then the owner of the Bender Reissue Patent but did not conduct any research in the field and did not manufacture apparatus for radioactivity well logging. It held no patents relating to such logging other than Bender and confined itself to rendering well completion services for hire to others. On the other hand, WSI did hold a number of patents and patent applications relating to radioactivity well surveying and was conducting research and development work in that field as well as manufacturing apparatus for use in that field.

In the contract of June 11, 1940, WSI licensed Lane-Wells under its patents to engage in radioactivity well surveying for others for hire and such license was exclusive with two exceptions, one of which was that WSI reserved the right to practice the methods for its own account. The agreement contained, among others, the following conditions: (1) Lane-Wells was required to purchase from WSI all detecting and recording instruments for use in its radioactivity well logging services, including those used in the exercise of the licensed right, together with all equipment and material directly related to radioactivity measurements; and (2) Lane-Wells agreed that it would not, during the contract term, engage intentionally in research and development work in radioactivity well logging but would leave such research to WSI, which agreed to continue it. This contract originally was to be in effect until December 31, 1950, and from year to year thereafter unless terminated by notice. However, under an agreement dated January 1, 1948, it was extended to December 31, 1960, but was actually terminated on April 16, 1951.

On March 3, 1942, WSI and Lane-Wells entered into a second written agreement under the terms of which WSI granted an exclusive license to Lane-Wells covering its new method of radioactivity well logging by means of "neutron-gamma ray logging". This is the method covered by the Fearon Patent in suit. This contract contained the same exceptions

and conditions as those contained in the June 11, 1940, agreement. It was extended to December 31, 1960, and then terminated on April 16, 1951.

On July 30, 1945, WSI and Lane-Wells entered into a third written agreement which granted an exclusive license to Lane-Wells under the WSI patents relating to a means or method for locating casing collars in radioactivity well logging for others for hire, i. e., the method and apparatus covered by the Swift Patent in suit. This contract contained the same two exceptions as did the other contracts. However, the agreement was conditioned only by requiring Lane-Wells to purchase all detecting and recording instruments utilized in practicing the licensed method from WSI. The contract was extended and terminated in the same manner as the two preceding agreements.

On April 16, 1951, WSI and Lane-Wells entered into another written contract, under the terms of which Lane-Wells surrendered its exclusive licenses granted in the three preceding contracts and such contracts were terminated. This agreement apparently came about, at least in part, as the result of two factors. In 1948, the first competition in the field appeared on the scene and, in 1950, Lane-Wells purchased the one-half interest in WSI capital stock that was formerly held by individual stockholders. By the terms of the new contract, Lane-Wells received a non-exclusive license under all of WSI's patents, including the three patents in suit, and agreed that WSI could license other persons to practice its patented methods. However, the right to license third persons was conditioned upon the using of one of two alternative agreement forms and upon the terms stated in the contract, except with the consent of Lane-Wells. These contract terms required that the licenses be granted only under all of WSI's patents and at fixed royalty rates. The two forms of license agreements were denominated as "Immunity" and "Research-Service and License" agreements and the precise forms thereof were set forth as exhibits to the April 16, 1951, contract. Lane-Wells was not granted a license to manufacture or procure instruments for practice of the licensed methods and none was permitted to be granted to research and service licensees. And, the royalty base of licenses which WSI was permitted to make with third parties was required to extend to all radioactivity well logging whether or not accomplished by a licensed means or method, except as Lane-Wells might otherwise consent.

The two forms of license agreements were to be offered on an alternative basis. The Immunity Agreement was designed for licensees who desired to do their own research and manufacture their own equipment. It was a bare license, at a royalty rate of 5 per cent, under all of the WSI and Lane-Wells patents relating to radioactivity well logging issued on or before December 31, 1950. Under this type of agreement the licensee could make his own instruments or have someone else make them but did not have the right to purchase the instruments from WSI or to receive the benefit of WSI's research. The Research-Service and License agreement was designed for licensees who did desire to take advantage of WSI's research efforts and to purchase the necessary instruments from WSI. It fixed the royalty rate at 15 per cent and granted a license under all present and future patents of WSI and Lane-Wells. This type of agreement did not grant a licensee the right to manufacture instruments himself or have them manufactured by someone else. Although it did not specifically require a licensee to purchase his instruments from WSI, the practical effect of this agreement was that a licensee would be guilty of infringing WSI's patents if he purchased infringing instruments from a source other than WSI.

The April 16, 1951, contract was to remain in effect until December 31, 1960, and from year to year thereafter until terminated by notice. It was in fact terminated by a subsequent agreement between the parties dated June 1, 1956. On that date, WSI and Lane-Wells en-

tered into a written agreement which the trial court found resulted in a "decisive change" in WSI's patent licensing policy. The April 16, 1951, agreement was terminated and the standard forms of license agreement were amended to permit research and service licensees to manufacture or procure instruments from sources other than WSI. This agreement did not contain any provision limiting the right of WSI to license others or requiring the consent of Lane-Wells to any such license. In addition, WSI published notice advising the public that it was prepared to license any or all of its patents on reasonable terms, it wrote letters to all of its existing licensees offering termination of existing agreements and negotiation of new ones on reasonable terms and it was willing to grant licenses under its patents, individually or collectively, upon negotiated reasonable terms.

The lower court found and held: By the agreements of June 11, 1940, March 3, 1942, and July 30, 1945, WSI misused its patents in that the agreements required Lane-Wells to purchase all of its detecting and recording instruments from WSI and prohibited Lane-Wells from engaging in research; during the effective periods of those three contracts, Lane-Wells did, in fact, purchase all instruments from WSI and refrain from conducting research in accordance with such contracts; the April 16, 1951, agreement was a substantial change from the 3 prior contracts in that it did not expressly provide that Lane-Wells should purchase the instruments from WSI and did not restrict Lane-Wells from conducting research; however, the April 16, 1951, contract did in fact also involve misuse of patents in two respects by requiring WSI to obtain the consent of Lane-Wells before granting a license to a third party on any form other than the standard forms set forth as exhibits to the agreement thereby coercing the acceptance of the standard forms and by the failure to give a Research-Service licensee an express license to manufacture its own instruments, the licensee in

effect was compelled to buy any instruments covered by WSI patents from WSI; from April 16, 1951, until June 1, 1956, WSI was dominant in the market for the sale of instruments and apparatus for radioactivity well logging and refused to sell such apparatus to persons other than those holding one of its license agreements; after June 1, 1956, it was no longer dominant in the market; by its actions in 1956, WSI " * * * accomplished a complete purge of previously existing patent abuses as of June 1, 1956. * * * "; and the royalty base employed in the license agreements by WSI after June 1, 1956, which included operations covered by expired patents, was not coercive but was voluntary upon the part of the licensees.

 The law in this area is no longer open to question. It has been held in a long line of patent cases that a patentee who utilizes a so-called "tying arrangement" will be denied all relief against infringement of his patent. The White Motor Company v. United States, 372 U. S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738; International Salt Cᴏ. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20; Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376; Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363; Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L. Ed. 852; Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371; Carbice Corp. v. American Patents Development Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819; Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871; Cole v. Hughes Tool Company, 10 Cir., 215 F.2d 924, cert. denied, 348 U.S. 927, 75 S.Ct. 339, 99 L.Ed. 726; Williams v. Hughes Tool Co., 10 Cir., 186 F.2d 278, cert. denied, 341 U.S. 903, 71 S.Ct. 612, 95 L.Ed. 1342; Berlenbach v. Anderson and Thompson Ski Co., 9 Cir., 329 F.2d 782, cert. denied, 379 U.S. 830, 85 S.Ct. 60, 13 L.Ed.2d 39. The Supreme Court stated in United States v. Loew's, Inc., 371 U.S. 38, 46, 83 S.Ct. 97, 102, 9 L.

Ed.2d 11, that " * * * [t]hese cases reflect a hostility to use of the statutorily granted patent monopoly to extend the patentee's economic control to unpatented products. The patentee is protected as to his invention, but may not use his patent rights to exact tribute for other articles." A tying arrangement has been defined as " * * * an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agree that he will not purchase that product from any other supplier * * * " and " * * * [w]here such conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed. * * * " Northern Pacific R. Co. v. United States, 356 U.S. 1, 5, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545.

▆▆▆ WSI contends that the April 16, 1951, agreement does not involve misuse of its patents and, in any event, such misuse was discontinued and purged as of April 1, 1954. It argues that the provision of the contract requiring WSI to obtain the consent of Lane-Wells before granting licenses to third persons in other than the specified standard forms and its failure to give a Research-Service licensee an express license to manufacture its own instruments were not misuses of the patents. The lower court found that the practical effect of the Research-Service license agreements issued pursuant to the April 16, 1951, contract was to require such licensees to purchase the necessary instruments from WSI. There is no showing that this finding is clearly erroneous and it establishes the prohibited "tying arrangement" that existed in the three prior contracts. Moreover, the contract imposes definite restrictions and restraints upon WSI's own activities and dealings with third parties in regard to its patents. It has been held that such agreements are against the public interest. McCullough v. Kammerer Corporation, 9 Cir., 166 F.2d 759, cert. denied, 335 U.S. 813, 69 S.Ct. 30, 93 L. Ed. 368; United States v. Besser Mfg. Co., 96 F.Supp. 304 (E.D.Mich.1951),

aff'd, Besser Manufacturing Co. v. United States, 343 U.S. 444, 72 S.Ct. 838, 96 L.Ed. 1063. Thus, the contract involves two prohibited provisions and is against the public interest.

WSI's argument on the point of discontinuation and purge of the misuse as of April 1, 1954, is apparently based upon the fact that as of that date Lane-Wells became the sole owner of all of the WSI stock and, therefore, there could be no illegal activity under the rule announced in Alpha Distributing Co. of Cal. v. Jack Daniel's Distillery, 207 F.Supp. 136 (N. D.Cal.1961), aff'd, 9 Cir., 304 F.2d 451. That case is not applicable here. It involved price fixing and concert between corporate affiliates to select a distributor. It does not involve patent licensing agreements which impose restrictions and restraints upon one party thereto and it has nothing whatever to do with a "tying arrangement".

▆▆▆ This case then involves a situation in which the contract providing for the prohibited practices endured in legal effect and in actual performance until June 1, 1956, at which time it was terminated. The acquisition of the remaining WSI stock by Lane-Wells on April 1, 1954, did not effectuate any basic change in the form of the contract, the practical relation of the parties or the performance of the contract. It was treated by both parties as legally binding and they continued to deal at arm's length. In short, there is nothing but the bare change in ownership of WSI stock to support WSI's position and under the law that is not sufficient to effect a purge. United States Gypsum Co. v. National Gypsum Co., 352 U.S. 457, 77 S.Ct. 490, 1 L.Ed.2d 465.

This brings us to the question presented on the direct appeal, namely, whether the lower court erred in holding that WSI had discontinued its misuse and purged itself as of June 1, 1956. McCullough first argues that the misuse of utilizing the so-called "tying arrangement" continued in at least 3 instances after June 1, 1956, and that the effects

of such misuse have never been fully dissipated. This assertion is not borne out by the record. The new agreement forms provided by the June 1, 1956, contract eliminated the two conditions in the April 16, 1951, agreement which were held to be improper. In addition, WSI notified its licensees and potential licensees by letter and public notice that. it would enter into new agreements or re-negotiate old agreements on reasonable terms under any or all of its patents.

■■ The second point has to do with the licensing methods used by WSI. McCullough asserts that WSI misused its patents by conditioning the licensing agreements upon the acceptance of a license under all of its patents in violation of the "package" or "block-booking" rules and that such misuses were never discontinued. It is true that a patentee unlawfully uses a patent monopoly when, for a fixed royalty, he refuses to grant a license under one or more of his patents unless a license is taken under all of his patents. United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260; Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852. However, in order to constitute a misuse, there must be an element of coercion, such as where there has been a request by a prospective licensee for a license under less than all of the patents and a refusal by the licensor to grant such a license. Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312. There is no such showing of coercion in this case. In fact the trial court specifically found: "After June 1, 1956, WSI has been willing to grant licenses on its patents individually or collectively upon negotiated reasonable

terms. * * * There was no coercion of licensees contracting subsequent to June 1, 1956, to accept license under all of the WSI patents unwillingly." (199 F.Supp. at 395)

Finally, McCullough contends that WSI has misused its patents, and continues to misuse them, by including unpatented operations in the royalty base under the license agreements and by collecting royalties under those agreements on operations covered by expired patents. It asserts that the patent relationship between a patentee and the sovereign requires that an expiring patent be made absolutely free to the unencumbered practice of all and that any restrictions upon such free practice by any means whatsoever is prohibited. It is undisputed that the license agreements in question are of the "package" type, under which all of WSI's patents in the field of radioactivity are included. The record does, indeed, show that under most, if not all, of those agreements the royalties payable are based upon the gross charges made by the licensee for his radioactivity well logging operations, including those not covered by the WSI patents. The record also shows that the royalty base in many, if not all, of the license agreements includes operations covered by patents that expired after the agreements were entered into by the parties.[8] In addition, the trial court found, and the evidence confirms, that WSI continued to the date of judgment below to grant licenses in which the royalty base includes receipts derived from operations covered by the expired Bender Reissue and Fearon Patents, except in instances where the licensee has accepted WSI's offer to license its patents on a narrower basis.[9] But, the trial court also found that while the royalty base in the license

8. These are, of course, the Bender Reissue Patent, which expired on October 18, 1955, and the Fearon Patent which expired on January 12, 1960.

9. The finding reads as follows:
"WSI has continued to the date of this finding to grant licenses in which the royalty base is all of the licensee's receipts from radioactivity well logging operations, including those covered by the expired Bender and Fearon neutron patents, except where the licensee has accepted WSI's offer to grant a license on an individual patent basis or on some other narrower basis. WSI continues to the date of this finding to receive royalty payments from one or more of its li-

agreements made by WSI after June 1, 1956, purported to include operations covered by the expired patents, such agreements were not coerced by WSI but were voluntary on the part of the licensee.[10] And, it is clear from the record that all of the license agreements included patents which had not expired. It should also be remembered that on June 1, 1956, WSI initiated a policy whereby it offered to terminate existing agreements and negotiate new ones on reasonable terms covering any patents the licensee desired.

The question thus presented is whether a license agreement covering a package of patents, voluntarily entered into by the parties, is unlawful by reason of the fact that the royalties payable thereunder are based upon the licensee's overall operations and upon a package of patents, some of which have expired or will expire during the effective period of the agreement. The validity of such an agreement was upheld by the Supreme Court in Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312. The facts in that case are almost identical with the facts in this case. There, as here, the license agreements offered by the patentee were of the so-called package type and included all of its present and future patents. The package licenses were offered for a flat percentage of the licensee's operations, whether or not any of the patents were used. There, as here, some but not all of the patents had expired before the license agreement in question was executed and more of them would expire during the effective period of the agreement. The Court held that the royalty provision did not create a monopoly or operate as a restraint of trade. It noted that there was no evidence to show that the patentee had " * * * refused to grant a license under any one or more of its patents to anyone who refused to take a license under all * * * " (339 U.S. at 831, 70 S.Ct. at 896) and said:

"* * * We cannot say that payment of royalties according to an agreed percentage of the licensee's sales is unreasonable. Sound business judgment could indicate that such payment represents the most convenient method of fixing the business value of the privileges granted by the licensing agreement. We are not unmindful that convenience cannot justify an extension of the monopoly of the patent. * * * We hold that in licensing the use of patents to one engaged in a related enterprise, it is not per se a misuse of patents to measure the consideration by a percentage of the licensee's sales." (339 U.S. at 834, 70 S.Ct. at 898.)

We have held our decision in this case in abeyance pending the opinion of the Supreme Court in Brulotte v. Thys Co., 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99. It was thought that Brulotte would have some bearing upon the aspect of the misuse issue presently before us and further arguments as to its applicability were heard upon the court's own motion. However, from those arguments and after a careful study of the Brulotte opinion, we are convinced that it does not compel or even justify a reversal on the issue of misuse. Nor do we think that other cases relied upon by McCullough require or justify such a reversal. E. g., Scott Paper Co. v. Marcalus Mfg. Co., 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47.;

censees calculated on a royalty base which includes receipts of the licensee from operations covered by the said expired Bender and Fearon patents."

10. That finding is as follows:
"While the royalty base employed in the standard license agreements made by WSI after June 1, 1956, included or purported to include operations covered by the expired Bender patent, the extension of the royalty base to cover practice of expired patents was not coerced, after June 1, 1956, but was voluntary upon the part of the licensees, who were offered a real alternative by WSI's offer to grant a license under any individual patent or patents upon negotiated terms."

Prestole Corporation v. Tinnerman Products, Inc., 6 Cir., 271 F.2d 146, cert. denied, 361 U.S. 964, 85 S.Ct. 93, 4 L.Ed. 2d 545; Ar-Tik Systems, Inc. v. Dairy Queen, Inc., 3 Cir., 302 F.2d 496; American Securit Co. v. Shatterproof Glass Corp., 3 Cir., 268 F.2d 769, cert. denied, 361 U.S. 902, 80 S.Ct. 210, 4 L.Ed.2d 157.

We certainly recognize the principles enunciated in Brulotte and the other cases but think there are important distinctions between those cases, on the one hand, and the Hazeltine case and this case, on the other. In Brulotte and Ar-Tik the license agreement under consideration attempted to extend the period for paying royalties beyond the date of expiration of the last of the patents covered by the agreement. That is not the case here or in Hazeltine. In the Ar-Tik and Shatterproof cases the licensees were coerced into taking a license agreement covering all of the licensor's patents by virtue of the licensor's refusal to grant anything but a package license agreement covering all of the patents. In other words, the licensee in those cases had to take all or none of the patents and no alternative was available. In both this case and Hazeltine, the package license was purely voluntary and a licensee who did not want the whole package could obtain a license on a reasonable basis covering any particular patent he did want. And, of course, neither the Scott Paper Co. case nor the Prestole case involved the issue of misuse of patents on the grounds here under consideration.

■■ We conclude that the facts of this case as found by the trial court upon ample supporting evidence bring it squarely within the rule of Hazeltine. We therefore agree with the trial court that WSI misused its patents in suit for the period beginning June 11, 1940, and continuing until June 1, 1956, but that such misuse was purged as of June 1, 1956. WSI may not recover during the period of the misuse for infringement of the three patents but is entitled to have its valid and unexpired patents en-forced against infringement occurring from and after June 1, 1956.

*The Motion For New Trial*

After judgment below, McCullough filed a motion for a new trial on the grounds of newly discovered evidence. This evidence consisted of expert opinions supporting the contention that the McCullough tool has a different mode of operation than Bender and Fearon; two WSI instruction manuals to prove non-infringement by the McCullough tool; and a series of demonstrations made by one of its witnesses at the hearing upon the motion below.

■■ A motion for new trial is addressed to the sound discretion of the trial court, and the granting or denial of such a motion will not be disturbed on appeal except for manifest abuse of discretion. Coffey v. United States, 10 Cir., 333 F.2d 945; Walter v. Warner, 10 Cir., 298 F.2d 481. Before a new trial may be granted on the basis of newly discovered evidence, there must be a showing that the alleged newly discovered evidence was discovered since the trial; facts from which the court may infer reasonable diligence on the part of the moving party; that the evidence is not merely cumulative or impeaching; that the evidence is material; and the evidence is of such a character that on a new trial it will probably produce a different result. Kansas City Southern Railway Company v. Cagle, 10 Cir., 229 F.2d 12, cert. denied, 351 U.S. 908, 76 S.Ct. 697, 100 L.Ed. 1443; Crow v. Dumke, 10 Cir., 142 F.2d 635. McCullough contends that these rules are not applicable to patent litigation because of the public nature of the subject matter and in support of such contention cites and relies upon Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 665, 64 S.Ct. 268, 88 L.Ed. 376. We do not agree. Jamco, Incorporated, v. Carlson, 10 Cir., 274 F.2d 338, 342.

■ The record not only fails to show facts from which an inference of diligence might be made and that the alleged newly discovered evidence would

produce a different result, but it also fails to show that such evidence was, in fact, newly discovered or discovered since the trial. Furthermore, the evidence relied upon would appear to be merely cumulative. Under all of these circumstances, it cannot be concluded that the lower court manifestly abused its discretion in denying the motion.

### Conclusion

We have carefully considered other contentions made by the parties and have concluded that they are without merit. The judgment below is therefore affirmed and the case is remanded for further proceedings in accordance with that judgment.

