**GATES LEARJET CORPORATION, a Delaware corporation, Plaintiff,**

v.

**MAGNASYNC CRAIG CORPORATION, aka Craig Corporation, a Delaware corporation**

**and**

**Auto-Take Incorporated, a Colorado corporation, Defendants.**

**Civ. A. No. C–1796.**

United States District Court,
D. Colorado.

Feb. 25, 1972.

Curtis, Morris & Safford by John A. Mitchell and Leonard Santisi, New York City, Davis, Graham & Stubbs by Robert H. Harry, Denver, Colo., for plaintiff.

Birch, Swindler, McKie, & Beckett by Edward F. McKie, Jr. and Dale H. Hoscheit, Washington, D. C., Sheridan, Ross & Fields by Philip H. Sheridan, Denver, Colo., for defendants.

## MEMORANDUM OPINION

WINNER, District Judge.

This memorandum opinion contains and shall constitute the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure.

The action is one for patent infringement; it arises under the patent laws of the United States, and, accordingly, the Court has jurisdiction of the parties and of the subject matter of the action under 28 U.S.C. § 1338(a) which gives United States District Courts jurisdiction of civil actions arising under the patent laws to the exclusion of any jurisdiction in the state courts.

The patents here being tested are:

1. *U. S. Patent No. 3,403,868*, a patent on a Magnetic Tape Cartridge System. This patent issued October 1, 1968.

   Patentee: William P. Lear.

2. *U. S. Patent No. 3,437,762*, a patent on a Multi-track Cartridge Player. This patent issued April 8, 1969.

   Patentees: William P. Lear and Samuel H. Auld.

3. *U. S. Patent No. 3,400,227*, a patent on a Combined Radio and

Tape Player. This patent issued September 3, 1968.

Patentees: William P. Lear and Samuel H. Auld.

4. *U. S. Patent No. 3,560,126,* a patent on a Magnetic Tape Cartridge Player System. This patent issued February 2, 1971, and it was added to the case after the complaint was filed.

Patentee: William P. Lear.

U. S. Patent No. 3,478,973 and U. S. Patent No. 3,521,009 were once in the case, but plaintiff has withdrawn these two patents from consideration by the Court, and as to these two patents, the complaint and the action shall be dismissed with prejudice.

Following a six day trial to the Court, the parties submitted briefs and supporting data which total some 394 pages. Oral argument was had following study of the briefs by the Court. Let it be said that seldom, if ever, has a case been more courteously, more thoroughly or better presented than was this case by counsel for both parties. The parties are well represented.

### The Parties

Gates Learjet Corporation, a Delaware corporation, is the owner of the patents in suit, and is the developer of a tape cartridge and tape player system known as the "8-track" or "Lear" tape system. About 75,000,000 cartridges utilizing the patents are sold yearly at an average price of $5.00 each.

Magnasync Craig Corporation, a Delaware corporation, also known as Craig Corporation, imports and sells electronic products including 8-track cartridge tape players.

Auto-Tape Incorporated, a Colorado corporation, is a seller of 8-track cartridge tape players and cartridges, and it is for the most part a nominal party to the case with its interests being represented by Craig.

A very real party in interest, but a party not subject to service of process and, accordingly, not a party to the action, is Pioneer Electronic Corporation, a Japanese manufacturer of 8-track cartridge tape players, which well may be quarterbacking the case for defendants.

### Historical and Important Background Facts

As will be seen before this memorandum is finished, the issues raised in the case pretty much run the gamut of patent law, but to put the case in focus, it is well to recite some of the facts concerning the development of the products with which we are concerned.

As would be supposed from the names of the patents, the patents in suit relate to magnetic tape cartridges and their use in tape players. The popularity of cartridge type tape players is of relatively recent origin, and even more recently the 8-track system has overtaken the 4-track system in popularity and sales. The 8-track system was always to be desired over the 4-track, but until improvements were developed, it was not commercially possible to record 8 tracks of music on a single narrow tape. Lear was determined to make this possible, and he did.

Simplistically stated, a magnetic tape player works in this way:—

A pre-recorded magnetic tape is moved past a playback head, and the recorded signals on the tape are changed into electrical impulses which are heard through the speaker or speakers in the music system. Utilizing a sort of involved figure eight configuration, the endless pre-recorded tape is mounted on spools in a cartridge which has two small openings in one end. One opening is for use with the playback head, while the other permits a drive capstan in the tape player to contact and, by friction, to move or drive the tape. This is accomplished with a pinch roller which presses the tape against the capstan, and the turning of the capstan drives or pulls the tape past the playback head at

a constant and predetermined speed.[1] [Industry accepted speeds are fractions of 60 inches per second, and today's most frequently used speeds are 7½ i.p.s., 3¾ i.p.s. and 1⅞ i.p.s.]

Standard tape is ¼", and on a mono tape each track plays different music, but on a stereo tape, two tracks play at once, one track being played through each of two speakers at the same time. Thus, with a stereophonic system playing an 8-track cartridge, four combinations of two tracks each can be played. Necessarily, with a tape only ¼-inch wide, the movement of the tape head to accurately mesh with the desired two tracks must be extremely precise, and, predictably, this precise movement is what is involved in one of the patents we are considering—Patent No. 3,437,762.

Many of the tape players in use are used in automobiles, and simplicity and safety in operation was one of the problems the industry faced in its infancy. The players are designed to permit insertion of the tape cartridge into an opening in the player, and the problems were immediately presented as to how to hold the cartridge in the opening in a way which would prevent it from bouncing around (which, of course, would mean that the part of the tape in contact with the tape head would move up and down and thus distort the musical replay) and how to provide for safe, simple and efficient insertion and removal of the cartridge from the player. Again it should come as no surprise to learn that the patents we are litigating have to do with a single V-notch on the side of the cartridge and a single spring mounted retention element or device used to hold the cartridge in the player and to hold the cartridge in a way that will permit the tape to remain steadily against the playback head as the capstan pulls the tape along. With the Lear device, a simple, low cost pinch roller

(even one slightly out of round) can be used. [Lear's answer to these problems appear in Patent Nos. 3,403,868 and 3,560,126.]

We are also involved with a patent on a switching method used in a combination radio and tape player. The automatic switching device puts the player into tape operating position when the cartridge is inserted, and when the cartridge is removed, the tape player disconnects, and the radio works. [This is Patent No. 3,400,227.]

William P. Lear is an almost legendary figure of limited educational background. However, he has obtained many patents, and he is best known for the Lear Jet airplane and for his work on a steam automobile. The patents we have before us were developed by him as a means of relaxation from the pressures and tensions of developing and producing the Lear Jet airplane. Earl "Madman" Muntz, of used car and television fame, got into the tape player field in about 1962. Lear took on the distributorship of the Muntz units in Wichita, Kansas, in 1963, and became interested in tape player problems. Lear discontinued his Muntz association because Muntz players were 4-track, and Lear wanted an 8-track system. Lear and Samuel Auld worked on tape players and cartridges evenings during the more hectic days of the Lear Jet airplane's development, and this hobby type work produced the patents which here are said to apply to products selling in the hundreds of millions of dollars.

Realizing that a major market for the tape players was in the automotive field, before mid-1964, Lear tried to interest General Motors in the product,[2] and he in fact produced and had installed a few of the units in cars belonging to General Motors executive personnel, but more of this later when we discuss the "public use" and "on sale" aspects of the case.

---

1. Earlier tape players did not contain a pinch roller, although a pinch roller was shown in an earlier application by Eash. However, this was a "flip-up" roller which held the tape against the capstan.

2. Several major manufacturers, including Ford, Chrysler, RCA and 3-M had done earlier experimental work in the field.

Lear also tried to interest RCA in the cartridge design with the thought of thus obtaining a large library of cartridge style tape recorded music. RCA did in fact put its music library on Lear cartridges, but the automobile companies did not have confidence in Lear's production facilities and he obtained no contracts from them.

Returning for a moment to the development of the products, we find that Lear and Auld set these goals:

1. They wanted an 8-track instead of a 4-track system.

2. They wanted a tape player unit which could be combined with a radio, and, for automobile use, it would have to approximate in size then current automobile radios, and would have to be simple and safe to use.

3. They wanted a cartridge which would be held in such a fashion that it would operate without distorting the music being played when the automobile was being driven on rough roads.

4. Due in part to the use of 8-tracks, they wanted extreme precision in the operation of the device used to shift tracks.

Earlier tape players were typified by the Fidelipac or Eash players. These were developed by George Eash, somewhat of a pioneer in the field, who testified at the trial. The differences between the Eash players and the Lear players were fully covered in the testimony, and it suffices to say here that the Eash cartridge was held in place by a spring which pressed against the rear of the cartridge. However, the cartridge utilizing this means of applying pressure did not prove to be readily marketable. Later, Eash developed units which worked with levers to en-

gage the tape, but, once more, he found no real acceptance for his product.[3] It was into this area of uncertainty that Lear and Auld moved, and with their players and cartridges an additional advantage was that wow and flutter were almost eliminated. [Wow refers to tape speed variations at frequencies up to six or eight Hertz, and flutter refers to variations above six or eight Hertz.]

Auld wanted to use two retention springs to push the cartridge forward. Lear came up with the idea of using a V-notch on one side of the cartridge with a single retention element which would push the cartridge forward and to one side at the same time. This provided the essential forward force and the lateral force provided part of the very important stability to the cartridge when the car was being driven on bumpy roads.

Earlier 4-track systems required the use of a lever to change tracks. The players developed by Lear and Auld require no levers to switch from track to track. Instead, a simple, but very precise rotatable cam is used. [The cam moves the head only $\frac{1}{1,000}$ of an inch to change from one track or set of tracks to another.]

Looking at the developed, perfected device, one's immediate reaction is, "Why didn't I think of that?" But, although many people had worked on the problem, Lear and Auld were the first to think of the solution, and simplicity does not defeat patentability. A. E. Staley Manufacturing Company v. Harvest Brand, Inc. (1971 10 Cir.) 452 F.2d 735. Their rotatable cam made 8-track tapes and tape players feasible with its minute and precise movement of the head.

Lear and Auld were safety conscious. Earlier players required manual operation of a switch to change from radio to tape mode, and they wanted to avoid

3. The players which antedated Learjet used a brake system to lock the disc which carried the tape in place when the tape was not being driven. Lear's first models used a brake which consisted of a pinch roller supported in the cartridge on a spring member. This braked the disc. Lear later discovered that the brake was unnecessary, and some of his prototypes used a fixed pinch roller—something then well known in the art.

this manual switching operation. As has been mentioned, this was solved by a switch actuated by inserting or removing the cartridge from the player. This feature was described by Auld:

" . . . so when you slide the cartridge into the unit, the cartridge strikes the switch and turns on the tape player, and the tape plays, and then when you take the cartridge out, even part way out, the radio plays, and that was very basic to our concept even way back at this time and has remained so ever since."

With this review of the background facts which led up to the adoption of the Lear type cartridge and player systems as the standard for the entire industry, we pass to a particularized approach to the several contentions made in the case, and, more detailed findings will be made in our discussion of these contentions.

### Obviousness

Defendants say that the patents are invalid because everything Lear and Auld did was obvious to anyone skilled in the art. This argument, of course, stems from 35 U.S.C. § 103, which provides:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. . . ."

After this case was tried, A. E. Staley Manufacturing Company v. Harvest Brand, Inc. (1971 10 Cir.) 452 F.2d 735, was decided. That case discusses obviousness, prior art and anticipation, and it is surely of no help to defendants here. In *Staley*, a feed block for cattle was involved. The feed block controlled the amount of molasses which cattle would consume, and it provided a means for adding unpalatable medicines to the feed. These were said by the Court to be "two new and novel results." In its discussion of the obviousness question, the Court said:

"Turning now to the issue of obviousness prescribed under 35 U.S.C.A. § 103, we have reviewed the prior art in order to determine whether a person ordinarily skilled in the art would find it obvious to combine the same elements in the same manner as Staley's patent teaches us.

"The record reveals that a person ordinarily skilled in the art would know that:

"1. Animal feed blocks had been made in the past such as salt blocks, mineral blocks, protein blocks and molasses blocks.

"2. Molasses had been used as a feed supplement and a carrier of unpalatable medicines.

"3. Mineral oils had been used to facilitate blocking and improve the weatherability of blocks.

"4. Feed supplements had been used which had high levels of salt.

"5. Blocks had been made which used wet molasses as a wet binder.

"The trial court made detailed findings to the effect that each and all of the ingredients employed by Staley in its patented block were well known to a man of ordinary skill in the art. The Court did not, however, make any findings dictated by the great weight of the evidence in the record reflecting the failures and drawbacks of the prior art in accomplishing the novel result achieved through the Staley patent. Each of the prior arts above referred to were wrought with practical limitations:

"1. Protein and mineral blocks were designed to fill a particular need not necessarily connected with the function of a molasses-salt block. As a carrier of medicines they were failures because they were not palatable enough to cattle to hide the taste of the medicines and their consumption was too variable.

"2. Molasses had long been known to aid animals with rueminate digestive tracts in digesting roughage. It has also been known to cause scouring if taken in large amounts. No molasses product was ever made before Staley's patent which allowed a livestock operator to place the medicine carrier unattended near his stock and be assured that his cattle were getting a proper amount of medicine. Protein and mineral blocks had too great a variation of daily intake to be successfully used. All previous molasses products were too palatable to use successfully as medicine carriers. The aggressive cattle would overfeed and the timid cattle would underfeed.

"3. Mineral oils were a rather novel and effective additioh to the prior art. However, the addition of oils in large amounts softened the blocks.

"4. Large amounts of salt have been incorporated into mineral and protein blocks to control consumption. The amount of salt used normally in these blocks is roughly the same amount as Staley used. However, with the highly palatable molasses blocks the daily consumption is relatively stable while the less palatable mineral and protein blocks show a relatively high rate of daily variation. . . .

"5. The use of a wet binder in molasses blocks was old in the art. Wet molasses had been used as a wet binder with dehydrated molasses to make the blocks easier to form. Wet molasses, however, causes blocking and storage problems. . . .

"Harvest Brand's expert witness testified that it would have been easy for anyone in the feed block business to come up with Staley's block in 1962. A Staley expert in animal feeds had previously testified that in 1962 he would have been dubious about the success of any molasses blocks which contained high levels of salt. . . .

"Harvest Brand points out that before 1962 there were many patents involving feed blocks, molasses products, molasses with medicine, and blocks with oil among others. However, most of these patented inventions had serious drawbacks. We said in McCullough Tool Company v. Well Surveys, Inc., 343 F.2d 381 (10th Cir. 1965), cert. denied 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966), supra, that:

'Rudimentary or unsuccessful experiments with isolated elements of a combination do not anticipate an invention which successfully combines those elements.' (Citations omitted.) 343 F.2d at 399.

"Staley admits that all of the elements are old and known in the art. However, Staley argues that as it overcame all of the problems and went against the teachings of the prior art to develop the patented block, it qualifies for a patent. We agree. As we said in McCullough, supra:

'The general rule is that before a device may be patentable, the improvement over the prior art must involve more than would be obvious to one of ordinary skill in the art. (Citations omitted). *If those skilled in the art are working in a given field and have failed after repeated efforts to discover a particular new and useful improvement, the person who first makes the discovery does more than make the obvious improvement which would suggest itself to a mechanic skilled in the art, and is entitled to protection as an inventor.'* (emphasis supplied). (Citations omitted.) 343 F.2d at 399.

"We feel that Staley has made such an improvement. In Bewal, Inc. v. Minnesota Mining and Manufacturing Company, 292 F.2d 159 (10th Cir. 1961), the test for determining whether a combina-

tion was patentable was stated. At 164 we said:

'When old elements are united in such a manner that the union accomplishes either a new result or an old result in a more facile, economical and efficient way in a particular environment which presented peculiar and difficult problems, it is a true combination and patentable.' (Citations omitted.)

"*Staley's inventors overcame serious practical problems in arriving at their patent and advanced the art to a new level of achievement.* (emphasis supplied)

"The invention requires only four ingredients. The amounts are not too critical. However, simplicity is not a bar to invention as long as the steps taken are not obvious to the ordinary mechanic. Blish, Mize and Silliman Hardware Company v. Time Saver Tools, 236 F.2d 913 (10th Cir. 1956), cert. denied 352 U.S. 1004, 77 S.Ct. 565, 1 L.Ed.2d 549 (1957); Goodyear Tire & Rubber Co., Inc. v. Ray-O-Vac Company, 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721 (1944)."

Mindful of the necessity for full findings on the question of obviousness and prior art, we consider the four patents we have before us.

### The 868 Patent

#### (Claim 12)

This is the patent on the retention system for holding the tape cartridge in its play position in the player with a single retention element to give forward and lateral (but not vertical) force for the purposes heretofore explained. More particularly, it covers a player system. The player has an opening for the cartridge, a side guide, a drive capstan and a single retention element. The retention element positions and holds the cartridge in the player. The rectangular cartridge holds the endless tape, and the openings in the cartridge permit the tape to contact the transducer and the capstan. The required pinch member is supported in the housing. The retention element is on the side nearest the capstan, and a spring works to bias the retention element into the opening. This engages the cartridge for play, but Claim 12 of –868 makes no mention of how the pinch roller is to be supported in the housing. Defendants make much of the Williams and Eash patents in support of their obviousness-prior art contentions. But, although Eash and Williams qualify as individuals having much more than ordinary skill in the field, the invention described in the –868 patent was not obvious to them—they never thought of it. Nor do the teachings of Reed or Gaubert make obvious the device patented in U. S. Patent No. 3,403,868, issued to Lear. The retention devices used by others differed greatly from the simplicity and efficiency of the Lear method. The language of McCullough Tool Company v. Well Surveys, Inc. (1965, 10 Cir.), 343 F.2d 381, quoted in *Staley*, supra, bears repeating:

"If those skilled in the art are working in a given field and have failed after repeated efforts to discover a particular new and useful improvement, the person who first makes the discovery does more than make the obvious improvement which would suggest itself to a mechanic skilled in the art, and is entitled to protection as an inventor."

As prior art, more than 70 citations were mentioned by defendants, and discussion of all of these citations would extend this opinion beyond endurable length. The Patent Office surely did not cite all of the prior art argued by defendants, but none is more pertinent nor significant than that in fact cited by the Patent Office.

Of the prior art cited by defendants against the –868 patent, only Bender shows a single retention element. Bender involves reel to reel tape combined with a film slide. The notch inclines in the opposite direction from Lear, and, most importantly, Bender utilizes a catch with a spring tongue. Under Bender, no forward force is derived from the retention element, and the

catch is essential. Williams, Nomura and the unpublished, unpatented Williams-Welch developments used two retention elements which developed little or no lateral force, and there is no suggestion that under their teachings, one of the retention elements could be eliminated. Eash and Gaubert were considered by the Patent Office—Eash in the –868 case and Gaubert in the –126 case. These show no side retention member, and, again, there is no showing of much if any side force.

The prior art did not make obvious the patented invention.

Lear's means of holding the cartridge in the player did in fact apply well known mechanical principles, but no one had ever before thought of applying them in this way to hold a tape cartridge in a player, and Lear did "more than make the obvious improvement which would suggest itself to a mechanic skilled in the art, and is entitled to protection as an inventor." A. E. Staley Manufacturing Company v. Harvest Brand, Inc., supra.

### The 126 Patent

■ In their briefs, the parties say that what they argued concerning the obviousness of the –868 patent applies fully to the –126 patent, and we think that what we have said concerning the –868 patent, and the prior art is fully applicable here to the –126 patent.

### The 227 Patent

■ This is a divisional application in which all per se player claims were withdrawn and transferred. Defendants say that the patented switching device was obvious. Yet, none of the prior art discloses it. The automatic changeover utilizing the cartridge to activate the switch was a new combination and it was a new element. It was not obvious.

Viets, relied on by defendants, disclosed a tape deck connected to a car radio. By utilizing a manual switch, a reel to reel tape could be played through the radio. No automatic switching from radio to tape was suggested and the means of inserting the cartridge was completely different. Chrysler Hi-Fi had nothing to do with tape players. It played records in combination with a radio. Manual switching was required. Flan and Dale had to do with cartridges comparable to Eash 4-track which required that the pinch roller be swung into engagement with the tape. There was no thought of automatic switching expressed. In his testimony, Eash almost conceded the inapplicability of this prior art.

Defendants also say that the –868 patent is prior art to the –227 and –762 patents. Defendants relied upon 35 U. S.C. § 102(f) which reads, "he did not himself invent the subject matter sought to be patented." To have the –868 patent held to be prior art to the –227 and –762 patents would require proof that Lear sole was prior to Lear and Auld. This was not proven. Rather, the evidence showed that all patents in suit were made simultaneously by reduction to practice when the first prototype was operable in December, 1963.

### The 762 Patent

■ A rotatable cam is not of itself new. But the Tenth Circuit said in Bewal, Inc. v. Minnesota Mining & Manufacturing Co. (1961) 292 F.2d 159:

"When old elements are united in such a manner that the union accomplishes either a new result or an old result in a more facile, economical and efficient way in a particular environment which presented peculiar and difficult problems, it is a true combination and patentable."

That test is met here. See, also, Eimco Corporation v. Peterson, etc., Company (1968, 10 Cir.) 406 F.2d 431; Warner & Swasey Co. v. Universal Marion Corp. (1964, D.C.Colo) 237 F.Supp. 719, aff'd 10 Cir., 354 F.2d 541 and A. E. Staley Manufacturing Company v. Harvest Brand, Inc. (1971, 10 Cir.) supra. Cams are not new. The Egyptians used them. But no one had ever

thought of using a rotatable cam to activate a playback head for use in conjunction with a tape cartridge. Namenyi-Katz uses a spiral cam; not a step cam, and the spiral cam does not approach the precision of the Lear step cam. Lundgren does not disclose the step cam. It shows a cam which moves a pinch roller to contact the tape; not to move the transducer head. Eggart is a patent on an embroidery machine, not a tape player. The 4-track Muntz players used a sort of a wedge shaped gadget to move the transducer head to one of two positions. None of the prior art used anything closely resembling the Lear-type cam.

Passing to the Rhoades patent, we find that the filing date on Rhoades is a little earlier than the filing date of –762. But, this is not controlling on the prior art question. 35 U.S.C. § 102(e) requires that the filing be before the invention patented in –762. The invention covered by –762 was made before the Rhoades filing, and, therefore, Rhoades is not applicable prior art. The prior art the Patent Office considered is as pertinent as any relied on by defendants, and with all of the prior art before him, a person skilled in the art would not have found the –762 device to be obvious.

U.S. Patent No. 3,403,868 [Claim 12] is not invalid because of obviousness or prior art. U.S. Patent No. 3,437,762 is not invalid because of obviousness or prior art. U.S. Patent No. 3,400,227 is not invalid because of obviousness or prior art. U.S. Patent No. 3,560,126 is not invalid because of obviousness or prior art.

As to all of the patents in suit, there has been commercial success, and the comments in Graham v. John Deere Co. (1965) 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545, are applicable.

### Public Use and On Sale

Defendants say that the inventors lost whatever rights they may have had to the –868 and –126 patents under the doctrines of "public use" and "on sale." Plaintiff launches a two-pronged response to these contentions of defendants. First, plaintiff says that the –868 patent (filed October 11, 1965) was a proper division of an application (Serial No. 393,083) filed August 31, 1964, which later became Patent No. 3,350,025. It is for this reason that the third sheet of the drawings of the original application was deleted, because that sheet concerned only the inner workings of the cartridge and the brake system. These were not germane to the divisional case, and, therefore, in that case the combined brake and pinch roller were described as optional—a matter to be discussed more fully presently. If plaintiff be correct in this position, the –868 patent is entitled to the earlier filing date, and the problems of public use and on sale don't arise. The Patent Office accepted the October 11, 1965, application as a division. We cannot presume that the Patent Office violated its own rules in permitting the filing, and there has been no showing that the action was arbitrary or capricious. Johnson & Johnson v. C. B. Stenvall, Inc. (1961 D.C.N.Y.) 193 F. Supp. 128. We agree with the Patent Office that the –868 application was a proper division. The Patent Office action was not arbitrary or capricious; it was not clearly erroneous; it was correct.

Bourns, Inc. v. Dale Electronics, Incorporated (1969 D.C.Neb.) 308 F.Supp. 501, says that the test is to examine the claims involved to see if those claims would "read on" the earlier filed application. We think that they do. In the earlier application, one of the inventions was a combination of brake and pinch roller spring mounting support. These were not claimed in the divisional application relating to the cartridge and retention element. Instead, this was referred to as an optional method. This was not new matter. The stop involved was a simple device to determine play position, not much different from stops used on chests of drawers.

Defendants' argument as to new matter fails.

**598**

■ We come now to the –126 patent, which issued on an application filed March 13, 1968. The issued patent says that it is a continuation in part of an earlier filed case (October 11, 1965), now the –868 patent. If it is a continuation in part, it relates back to the earlier date under 35 U.S.C. § 120. And, if the –868 patent can relate back to August 31, 1964, the –126 patent piggybacks its way on –868. To relate back to the –868 date, the four conditions of 35 U.S.C. § 120 must be met. These, according to Holmes v. Thew Shovel Company (1969 D.C.Ohio) 305 F.Supp. 139, are:

"(1) Both applications must disclose the same invention,

"(2) the applications must be made by the same inventor,

"(3) the second must be filed before patenting of the first application or its abandonment, and

"(4) the second application must contain a reference to the earlier application."

The application divided out a sole invention of Lear's from a joint application of Lear and Auld. This procedure is permitted by the Patent Office. See, Manual of Patent Examining Procedures, p. 8. There was a sufficient disclosure of the claims in the first application, and the tests of *Holmes* are satisfied.

With this, then, we could end our discussion of public use and on sale, but we do not choose to do so, and we consider plaintiff's related arguments as to whether the principles of public use and on sale apply even if the applications be held not to relate back. This we do to permit the presentation of all issues to the Court of Appeals.

■ In late 1963, or perhaps early 1964, Lear showed a prototype player to Knudsen, the head of the Chevrolet Division of General Motors. He expressed interest. A second prototype player was installed in Knudsen's car. Thereafter, approximately 100 sheetmetal, experimental units were built. They cost at least $2,000 each to build because of all of the handwork. About 20 of the units were sold as experimental units for $250 each, and they were then installed in experimental cars in Detroit. The $250 figure was completely arbitrary, and had no relationship to cost or to profit or loss, Additionally, two of the units were sent to RCA on a $400 memo billing for each of the units. Learjet, General Motors and RCA all treated the handbuilt prototypes as experimental. They were experimental. They were not designed for commercial production, and in that form they couldn't have been commercially produced. The fact that Lear hoped that with further development units could be manufactured which would have commercial success does not destroy the experimental character of these first hand made players.

Defendants rely in part on the classic case of Egbert v. Lippmann (1881) 104 U.S. 333, 26 L.Ed. 755. There, the inventor gave a corset stay to a lady friend of his, and this was held to put the corset stay in the public domain if not in public view. The Supreme Court said:

"An invention may consist of a lever or spring, hidden in the running gear of a watch, or of a rachet, shaft, or cog-wheel covered from view in the recesses of a machine for spinning or weaving. Nevertheless, if its inventor sells a machine of which his invention forms a part, and allows it to be used without restriction of any kind, the use is a public one. So, on the other hand, a use necessarily open to public view, if made in good faith solely to test the qualities of the invention, and for the purpose of experiment, is not a public use within the meaning of the statute."

Defendants rely additionally on cases such as Strong v. General Electric Co. (1970 5 Cir.) 434 F.2d 1042; Amphenol Corp. v. General Time Corp. (1968 7 Cir.) 397 F.2d 431, and Super Mold Corp. v. Clapp's Equipment Division, Inc. (1968 9 Cir.) 397 F.2d 932. Plaintiff relies on cases such as Ushakoff v. United States (1964) 327 F.2d 669, 164

Ct.Cl. 455; Watson v. Allen (1958) 103 U.S.App.D.C. 5, 254 F.2d 342; Universal Marion Corp. v. Warner and Swasey Co. (1965 10 Cir.) 354 F.2d 541, and Merrill v. Builders Ornamental Iron Co. (1952 10 Cir.) 197 F.2d 16.

The record here discloses that, as was said in *Ushakoff*, supra, "there was no pretense that (the tape players) were ready for actual use as (commercially feasible tape players)." The use was experimental. It comes within the use discussed by Judge Pickett in *Universal Marion Corp.*, supra. It was there said:

"It is contended that the use of the early Ferwerda machines constitutes a public use within the meaning of the statute. It is well settled that all uses do not necessarily constitute a public use. 'Use by an inventor in good faith for the purpose of testing his apparatus or device for experimental purposes is not public use within the scope of the statute, even though incidental to such use he derives some financial return.' Merrill v. Builders Ornamental Iron Co., 10 Cir., 197 F.2d 16, 19. See, also, McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d at 393–394. The trial court found that the use of the machine more than one year prior to the application for patent was a good-faith use for experimental purposes and not a public use."

The use of the handmade prototype tape players more than one year prior to the application (if the application should be held not to relate back) was a good faith use for experimental purposes, and it was so treated and intended by all parties to the use. There was no public use, and the tape players were not on sale within the meaning of the statute.

*Disclosure of the Best Mode Known to the Inventor*

Defendants charge that the –868 and –126 patents fail to show utilization of the tape guide for positioning the tape and locating the cartridge in the player. The August, 1964 application refers to another application then pending. The application explains:

"This permits the use of a slotted opening in the player for the cartridge, and effects its playing directly, without the need for collateral levers. Such player system is shown and described in the copending patent application Serial No. (29–1) [393,212] filed [August 26, 1964], and assigned to the same assignee."

Additional references are made to the copending application, and it fully describes the material defendants now say is importantly missing from the application in question. Incorporation by reference is proper. National Latex Products v. Sun Rubber (1959 6 Cir.) 274 F. 2d 224; Merck & Co. v. Chase Chemical Co. (1967 D.C.N.J.) 273 F.Supp. 68. The allegedly missing statements were present because they were incorporated by reference.

Defendants say that the failure to mention the tape guide renders the –868 patent invalid. This, defendants argue, results from the fact that the tape guide is necessary to the operation. The argument is not persuasive. The claim had to do with a single retention element to provide the sole forward and lateral forces on the cartridge. The vertical position of the cartridge was not a matter of major interest. "Admitting that additional elements are necessary to render the device operative, it does not necessarily follow that the omission of these elements invalidates the claim." Deering v. Winona Harvester Works (1894) 155 U.S. 286, 15 S.Ct. 118, 39 L. Ed. 153. See, also, Stiegele v. J. M. Moore Import-Export Co. (1963 2 Cir.) 312 F.2d 588.

That which has just been said is applicable to defendants' arguments concerning lack of disclosure of the use of rollers on the side guide and the fact that an off-set capstan will work.

*The Oath*

Defendants say that because new matter was added in the –868 and –126 ap-

plications, a new oath was required as to each. What we have already said disposes of most of defendants' arguments concerning the oath. We have ruled against defendants on new matter, public use and on sale, and we need not here repeat what has been decided on those issues.

The requirements of 35 U.S.C. § 115 were met. If the wrong form of oath was used, this is a procedural matter to be passed upon by the Patent Office. The form of the oath is not subject to review by this Court, but the evidence establishes that no false oath was filed.

### Infringement

Defendants have stipulated that if the patents in suit are valid (and we hold that they are) some Craig players infringe and that Auto-Tape completed the infringement of Claim 12 of the –868 patent when it installed cartridges in the players Craig sold.

Defendants argue that many Craig players use hold down springs to position the cartridges vertically. This, defendants urge, takes Craig out of Claim 12 which covers the single retention element to position the cartridge to provide the forward and lateral forces. Craig's hold down springs don't provide forward force; they don't provide lateral force; they don't avoid infringement. Craig models using a spring indent or retention member (typified by Model 3121 Code 01) infringe the –868 patent. Craig models using a spring biased engaging device and an ejecting mechanism (typified by Model 3119) infringe the –868 patent.

Craig models using a magnetic latch construction (typified by Model 3121 Code 02) present a separate problem. Plaintiff concedes that these players do not literally infringe the –126 patent, but says they infringe under the doctrine of equivalents. This doctrine has been described as "a judge-made doctrine evolved to deal with infringers who introduce minor variations to conceal their infringements. The essence of the doctrine of equivalents is that one may not practice a fraud on the patent by appropriating an invention through minor and insignificant changes in a device to avoid the patent. Its theory is that if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are substantially the same; even though they differ in name, form or shape. What is prohibited is not merely outright duplication but also that more subtle duplication which is accomplished by a change in one of the noncritical aspects of the patent's teachings." 60 Am. Jur.2d Patents, § 389, p. 537.

The magnetic latch is more than a subtle, minor, and insignificant variation. It may do the same work, but it doesn't do it in the same way described in any of the Learjet patents. Craig models using the magnetic latch are not equivalent and they do not infringe the –868 patent or Claim 1 of the –126 patent.

Defendants have stipulated that Claims 1, 2 and 3 of the –762 patent are infringed by certain Craig models if the patent is valid and we have said that it is. A determination of which models infringe will await the accounting, but we find and conclude that both defendants have infringed U.S. Patent No. 3,437,762.

Defendants have stipulated to infringement of Claims 1, 3, 4 and 5 of the –227 patent if the patent is valid, and we say that it is. Again, a determination of the models which infringe will await the accounting, but we find and conclude that both defendants have infringed U.S. Patent No. 3,400,227.

Defendants position with reference to the –126 patent is essentially the same as is their position on the –868 patent, and we have discussed infringement of this patent in our discussion of magnetic latch models. The hold down springs don't help them any more under the –126 patent than they do under the –868 patent, and, subject to what has been said concerning magnetic latch models,

the models which infringe will be determined in the accounting, but both defendants have infringed U. S. Patent No. 3,560,126.

In summary form, and again subject to our determination as to magnetic latch models, we find that both defendants, Craig and Auto-Tape, have infringed United States Patent Nos. 3,437,762, 3,400,227 and 3,560,126. Defendant Auto-Tape has actually infringed Claim 12 of United States Patent No. 3,403,868 and Craig induced infringement of Claim 12 of that Patent and contributorily infringed it by selling tape players having as a material part thereof the invention of Claim 12. Craig knew the players to be especially made or adapted for use in infringement of Claim 12. The players were not suitable for substantial non-infringing use.

We find that infringement has been established by the testimony, admissions made, catalogs and other printed material, and by the models received in evidence.

### Misuse of Patents

"It is a principle of general application that courts and especially courts of equity, may appropriately withhold their aid where the plaintiff is using the right asserted contrary to the public interest." Morton Salt v. G. S. Supiger Co. (1942) 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363. "The courts withhold aid to a party who has used his patent rights contrary to the public interest." Well Surveys, Inc. v. Perfo-Log, Inc. (1968 10 Cir.) 396 F.2d 15. See, also, Sears, Roebuck & Co. v. Stiffel Co. (1964) 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661; Compco Corp. v. Day-Brite Lighting (1964) 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669; Lear, Inc. v. Adkins (1969) 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610, and, most recently, Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation (1971) 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788, where the the court said:

"Two terms ago in Lear, Inc. v. Adkins, we relied on both lines of authority to abrogate the doctrine that in a contract action for unpaid patent royalties the licensee of a patent is estopped from proving 'that his licensor was demanding royalties for the use of an idea which was in reality a part of the public domain.' 395 U.S. at 656 [89 S.Ct. 1902.] The principle that 'federal law requires, that all ideas in general circulation be dedicated to the common good unless they are protected by a valid patent,' 395 U.S. at 668 [89 S.Ct. 1902], found support in Sears and Compco, and the first line of cases discussed above. The holding that licensee estoppel was no longer tenable was rooted in the second line of cases eliminating obstacles to suit by those disposed to challenge the validity of a patent."

Defendants charge that plaintiff's conduct violated this important public policy and that plaintiff is guilty of patent misuse and is not entitled to relief here because of the alleged misuse. The charge stems from the fact that Learjet attempted to license the entire dustry (but there is nothing wrong with that) and the further fact that Learjet set a deadline of May 15, 1971, within which manufacturers could request licenses. If they didn't license by that date, Learjet said that it wouldn't thereafter license them. Before Lear, Inc. v. Adkins (1969) 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610, Learjet's conduct might indeed prove troublesome in a consideration of a charge of patent misuse, but after Lear, Inc. v. Adkins, it is difficult to accept defendants' argument. Now, there is no longer any estoppel by license, and a licensee can challenge a patent's validity at any time.

By its very nature, a patent gives to its holder the right to permit or refuse to permit another to use the patent. A patentee need not license anyone. Bela Seating Company v. Poloron Products, Inc. (1968 D.C.Ill.) 297 F.Supp. 489; American Photocopy Equipment Co. v. Rovico, Inc. (1966 D.C.Ill.) 257 F.Supp. 192; Rocform Corporation v. Acitelli-Standard Concrete Wall, Inc.

(1964 D.C.Mich.) 237 F.Supp. 34. There is no tying agreement here involved; there is no agreement not to deal in competitive products; there is no coercive package deal arrangement. There is no patent misuse. All manufacturers were given a shot at the same choices. They could take a license or they could gamble on a suit and hope that the patents would be declared invalid. Defendants gambled. They lost.

### Japanese Patent Office Action

As if we didn't have enough problems in this case, during the briefing period after the trial was concluded, both parties asked to reopen to supplement the record. This was permitted, and now we have an argument as to whether plaintiff made certain admissions against interest in the course of proceedings in the Japanese Patent Office. A reading of the English translation of the Japanese record can lead to no conclusion other than that *in English* perhaps there is some ambiguity. How much of this ambiguity results from the translation from one language to another, this Court cannot say. However, the translation can be read to say that the allegedly damaging statements were made with reference to the Nomura patent rather than with reference to the Lear patent. If all of the proceedings had been in English, the Court would not be inclined to read these references as very damaging [and certainly not controlling] admissions, and taking into account the fact that we are dealing with a translation from one language to another, the Court doesn't find any admission against interest in the Japanese proceedings.

Because of the presumption of validity attaching to any patent, defendants had to carry the burden of establishing invalidity of the patents. Defendants failed to carry their burden. Inevitably, then, we must and we do conclude:

1. The invention described in Claim 12 of Patent No. 3,403,868, and all of the claims of Patent Nos. 3,400,227, 3,437,762 and 3,560,126 are not anticipated by any prior art. Claim 12 of the –868 patent and all claims of the other patents in suit describe and define patentable inventions.

2. Claim 12 of the –868 patent and all litigated claims of the other three patents in suit do not cover matters which would have been obvious at the time of the inventions to persons having ordinary skill in the art.

3. Claim 12 of the –868 patent and all litigated claims of the other patents in suit have utility and novelty; they were not obvious; there has been commercial success; there has been no patent misuse; there is no invalidity due to the form or content of an oath, and Claim 12 of the –868 patent and the litigated claims of the other patents are valid in all respects, all as has been heretofore discussed.

4. Defendants have infringed Claims 1, 3, 4 and 5 of Patent No. 3,400,227; they have infringed all of the claims of Patent No. 3,437,762; they have infringed Claims 1, 2 and 3 of Patent No. 3,560,126. Defendant Auto-Tape has infringed Claim 12 of Patent No. 3,403,868 and defendant Craig has induced infringement of that claim and has contributorily infringed it.

5. Plaintiff is entitled to:

(a) An accounting for damages in accordance with applicable law.

(b) Judgment for damages when they are thus ascertained.

(c) An injunction against each of the defendants and all those in privity with them enjoining them from further infringement of any of the claims here found and held to be infringed.

(d) Its lawful costs and disbursements.

6. Plaintiff's claim for treble damages and its claim for attorneys' fees will be heard and determined at the time of the accounting.

7. Defendants' counterclaims and the actions therein contained shall be dismissed with prejudice.

8. The complaint and the action insofar as Patent No. 3,478,973 and Patent No. 3,521,009 are involved shall be dismissed with prejudice.